# CHARLESTON.

### STATE v. JOE McDONIE.

Submitted September 27, 1921.    Decided October 4, 1921.

1. CRIMINAL LAW—*Form of Oath Administered to Jury Need Not be Entered on the Record.*

    It is not necessary that the form of the oath administered to the jury in a felony case should be entered on the record. It is sufficient if the record shows that the jury was duly sworn. (p. 191).

2. SAME—*Effect of Recital that Jury was Duly Sworn in Order Empanelling it.*

    A recital in the order impanelling the jury in a felony case that the jury was duly sworn will not be overcome by another recital attempting to give the effect of the oath administered, which indicates a failure of full compliance with the form of oath usually administered in such cases. (p. 191).

3. VENUE—*In Criminal Case May Be Proven by Other Than Direct Testimony.*

    The venue in a criminal case need not be proven by direct testimony. When the facts proven show that the crime could not have been committed in any other county than that named in the indictment the venue is sufficiently proven. (p. 193).

4. SAME—*Judicial Notice will be Taken of Location of City of Huntington.*

    Judicial notice will be taken of the fact that the city of Huntington, West Virginia, is in the county of Cabell, and is the county seat thereof. (p. 193).

5. EVIDENCE—*That Persons Heard Outcries Coming from House of Defendant Indicating Severe Castigation Admissible Where Basis of Prosecution is Successive Assaults Upon a Child of Tender Years.*

Where the basis of a prosecution is successive assaults inflicted upon a child of tender years, evidence of persons that, within a few days prior to the last assault which resulted in the arrest of the defendant, they heard, coming from the house of the defendant, outcries indicating that the child was being severely castigated, and heard what they took to be the defendant's voice in connection therewith is admissible, and the fact that some of the witnesses who testified to these occurrences may not have distinguished the defendant's voice does not render their evidence inadmissible, where it appears that other witnesses who heard the same occurrences did recognize the defendant's voice in connection therewith. (p. 193).

6. MAIMING DEFINED.

To maim means to violently inflict a bodily injury upon a person so as to make him less able to defend himself or annoy his adversary. (p. 195).

7. INSTRUCTION—*Defining Technical Terms Used in Indictment Should be Given.*

In the trial of a criminal case, where technical words are used in charging the defendant with the offense, the court, upon request, should define such technical terms to the jury, but it is not error to refuse an instruction attempting to define such a technical term when the definition given is not accurate. (p. 195).

8. FELONIOUS ASSAULT—*Jury May Find Stepfather was Actuated by Malice in Prosecution for Committing Felonious Assault Upon Six-year Old Stepson.*

In a prosecution against a stepfather for committing a felonious assault upon his six-year old stepson, if it is shown that the treatment to which such stepson had been subjected was such as to result in serious bodily injury to him, the jury may from that fact find that the punishment inflicted was in excess of that which the law contemplates, and may also find from the same fact that such stepfather was actuated by malice, as well as that he acted with a criminal intent. (p. 197).

9. EVIDENCE—*Underclothing and Bandages Found in Bed of Child as Evidence in Prosecution of Stepfather for Assaulting Such Child.*

In a prosecution against a stepfather for assault upon his

89 W. Va.

stepson the child's underclothing found in the bed from which the child was removed by officers arresting the father, as well as bandages therein found which apparently came from the legs of such child, are properly admitted in evidence, even though the witnesses did not notice these articles at the time they removed the child, but upon their return, later the same day. discovered and removed them.    (p. 198).

Error to Circuit Court, Mason County.

Joe McDonie was convicted of malicious assault and he brings error.

*Affirmed.*

*D. B. Daugherty, R. L. Saunders, B. H. Blagg* and *Sommerville & Sommerville,* for plaintiff in error.

*E. T. England,* Attorney General, *R. A. Blessing,* Assistant Attorney General, and *Robert L. Hogg,* Prosecuting Attorney, for the State.

RITZ, PRESIDENT:

The defendant was found guilty by a jury upon an indictment charging him with having committed a malicious assault upon his stepson James Gibson, with intent to maim, disfigure, disable and kill him, the said James Gibson, and to review a judgment sentencing him to confinement in the penitentiary rendered upon said verdict he prosecutes this writ of error.

It appears that in the month of June, 1920, the defendant Joe McDonie married Susie Gibson, who was the widow of James M. Gibson, and the mother of James Gibson, a boy six years of age.    Prior to her marriage to McDonie this child had lived for sometime with his grandparents, but when the McDonies went to housekeeping in the city of Huntington the child was taken to live with his mother and stepfather. On the 21st of August, 1920, the child's uncle had information from some source that the boy was being mistreated, and went to the residence of the McDonies to inquire about it. When he got to the McDonie residence he asked Mrs. McDonie how the boy was, and upon being informed that he was all right he asked where he was, and if he might see him. He was informed by Mrs. McDonie that the boy was up-

stairs, but that he could not see him.     He then attempted to
go upstairs to see the child, but was prevented by Mrs. Mc-
Donie.     He thereupon went to the telephone to call the police
and Mrs. McDonie attempted to prevent him from doing so,
but in this he succeeded, and when the officers came they en-
tered the house and found the child in a room upstairs lying
in bed.     An examination disclosed that he had been badly
mistreated, and the chief of police directed the boy to be tak-
en to a doctor for attention. The boy's uncle took him to a
hospital and called a doctor and also a trained nurse to at-
tend him.     He was examined upon his arrival at the hos-
pital, and the doctor and nurse testify as to his condition at
that time.     It was found that he was very much emaciated,
was suffering from shock, and from abrasions and bruises all
over his body.     The nurse testifies that his head was one
mass of bruises; that his left ear was torn at the top and bot-
tom, and that there was a deep abrasion at the back of this
ear; that his right ear was also torn at the top, and a deep
abrasion at the bottom of it; that two lower teeth were miss-
ing and the cavities filled with pus; that there was a deep
abrasion in his lower lip, and his tongue cut in several places;
that his throat was lacerated; that he was unable to swallow
even water; that his back was covered with scratches, bruises
and cuts, many of which were infected, the nurse testifying
that she counted sixty-eight of these cuts on his back; that
there was a cut in his left arm extending across the axillary;
that there was a burn on his left hand of considerable size,
and that the knuckles of his right hand had a seared burn
thereon; that the palms of both hands were blistered with
burns which left deep pits in which there was pus; that his
abdomen was a solid bruise, being black at the time of the
examination, changing to green in forty-eight hours there-
after; that the back of one of his legs had two seared burns,
underneath which there were scabs; on the left leg was one
burn; that both feet were badly scalded, the burns extending
from his toes up to his ankles and all over the feet; on one
foot extending underneath and between the toes so that gauze
had to be kept between them to keep them from growing to-
gether.     His condition was such that the child, according to

the testimony of the physician and nurse, was on the verge of convulsions, and for three or four nights neither ate nor slept, but simply lay in a stupor.   The doctor who attended him testifies that he was very much alarmed as to his condition and about his recovery.   The defendant and his wife were arrested and taken to jail.   An indictment was found against them charging them with maliciously wounding the child, and on their motion the case was removed for trial from Cabell county into the circuit court of Mason county.

Upon the trial of the case the state introduced a number of witnesses who testified that they heard screams from the child at various times during the week just previous to the arrest of the defendants; that they heard splashing in the bathtub, and the child calling for help while this was going on; and that they heard McDonie's voice apparently in the same room.   At the time he was arrested he admitted  having whipped the child much harder than he should have, and also admitted that after he had so whipped him he tied his feet together and held him in the bathtub and turned the hot water in on him, and held him there for the purpose of scaring him, as he says; that the water was hotter than he thought it was and severely scalded both of the child's feet, so badly that the skin pulled off them when his socks were removed after he was taken in charge by the police officers. McDonie denies that he ever whipped the child on any other occasion except once very moderately.   He testifies that the occasion for the last whipping administered to him was that on the night before, when he came home to his supper about eight o'clock, the child went upstairs with him; that he shaved and was getting ready to take a bath when he noticed the child's absence; that he called down to his wife to know if he was downstairs, and upon being informed that he was not that he immediately dressed and went out and searched for the child; that this was about ten-thirty o'clock in the evening; that this search continued until sometime after midnight, and that the child was recovered and brought back by his uncle somewhere near two o'clock; that they then ate their supper and went to bed; that on the next day they got up about eleven o'clock in the morning and had breakfast

between that time and twelve o'clock;. that after breakfast was over he made inquiry of his wife as to whether or not the boy should be corrected or chastised for running away the evening before, and his wife suggested that he be sent to bed and made to stay there all day.   She told the boy to go upstairs and go to bed, and he says the boy refused to do so; that his wife thereupon got him some switches, and he took the switches and the boy upstairs and chastised him; that he was not able to make him submissive by the use of the switches, and he thereupon conceived the plan of tying his feet together and putting him in the hot water in the bathtub; that when he discovered that this water was hotter than he thought it was he.allowed the boy to get out of the tub and get in bed, and he went to a drugstore and got some salve which his wife applied to the boy's feet, and put some bandages on them, and that he thereupon went out to his work and was subsequently arrested on the street about nine o'clock. It was further shown upon the trial that McDonie had been married to the boy's mother less than two months; that the boy's father had been killed in a railroad accident several years before, in fact before the boy's birth, and that in a suit to recover on account of his wrongful  death the sum of $3750.00 was awarded, one-half of which belonged to the boy at the time of the occurrences herein referred to, and one-half to the mother.     After being arrested McDonie  stated to a deputy sheriff at the jail that he had whipped the child because he had run away, and put him in the bathtub to scare him, and tied his feet together, but that he did not know the water was warm enough to do the child any injury.     He. also stated to another witness while being taken to jail that . they were going to try to railroad him for the offense, and in reply to an inquiry stated that he did whip the child unmercifully; that he whipped the blood out of him all over. These statements McDonie did not deny, nor did he attempt in any way to explain them.     His wife was introduced as a witness in his behalf and corroborated his statements as above outlined.     The theory of the state was that this child had been subjected to repeated indignities during at least the week prior to the arrest of the defendant; that this is borne

out by the testimony of the witnesses who heard the child's
outcries on different occasions and heard McDonie's voice
apparently directing his   chastisement; that it is further
borne out by the fact that his limbs and his body were cov-
ered with sores, a number of which were apparently of some
age from the reason that they had become infected and filled
with pus; that the result of these repeated assaults or attacks
and chastisements which culminated in the conduct   above
narrated on the 21st day of August was that the boy was
at the point of death at the time he was rescued by his uncle.
In fact it was apparent from the testimony of the physician
who attended him, and of the nurse in whose custody he was
for two weeks, that had he not received medical attention at
the time he did he would not long have survived.

The defendant assigns a number of errors committed by
the court during the trial of this case, the first of which is
that it appears from the record that the jury was not prop-
erly sworn.   The order impanelling the jury relates that
the plea of not guilty was entered and issue joined thereon,
and proceeds: "and thereupon came (naming the twelve
jurors) twelve good and lawful men selected in the manner
required by law duly qualified to sit in said case, who were
duly sworn to well and truly try according to the evidence
and true deliverance make of the prisoner at the bar Joe
McDonie, who, they should have in charge." It is contended
by the defendant that if the order had only recited that the
jury had been duly sworn it would have been sufficient, but
that inasmuch as it goes on and attempts to recite, according
to defendant's contention, the oath that was administered,
and which oath does not appear to have all of the requisites
of the oath required by law, this negatives the statement
that they were duly sworn, and shows affirmatively that the
oath administered was not the oath required by law.   It is
true that if the recital in the order contains the oath actually
administered, then it is not in the form ordinarily administer-
ed in felony cases.   There is no statute prescribing any par-
ticular form of oath, but there is a form well recognized, with
which the profession is fully acquainted, the requirements of
which it is contended are not met by the oath administered

in this case. Does the order in this case attempt to set out the oath actually administered, or to state the proposition in another way, is the matter contained in the order, after the recitation that the jury was duly sworn, anything more than the clerk's interpretation of what was done, merely a paraphrase by him of the oath actually administered? The order does not in so many words say that the language in it was the oath administered, but it does say in direct language that the jury was duly sworn, and can it be said that this positive declaration will be overcome by the further statement above quoted? It does not appear in the record that any objection was made to the oath administered to the jury at the time it was impanelled, and this fact is significant, for it is unthinkable that the defendant and the eminent counsel who represented him at the trial would sit by and permit an improper oath to be administered to the jury without calling it to the attention of the court. The statement in the order is not very far from the requirements of the oath ordinarily administered in this kind of a case, and even though it appeared affirmatively that the oath was administered in that form, we are not prepared to say that it would not be a substantial compliance with the requirements of the law. It is not necessary, however, for us to discuss this proposition as we are of the opinion that this order does not undertake to quote the oath actually administered, but simply to give the clerk's interpretation of it, and that inasmuch as the order shows affirmatively that the jury were duly sworn we will presume, in the absence of something more positive to the contrary, that the law has been complied with, and this presumption is strengthened by the fact that so far as the record shows neither the prisoner nor his counsel made any objection to the oath as it was actually administered to the jury. This conclusion is fully supported by our decisions upon this question. *Lawrence* v. *The Commonwealth,* 30 Gratt. 845; *State* v. *Sutfin,* 22 W. Va. 771; *Wells* v. *Smith,* 49 W. Va. 78; *State* v. *Kellison,* 56 W. Va. 690. In each of these cases the language used in the order that the jury was duly sworn was supplemented, in some of the cases by a statement that the jury was sworn to speak the truth upon the issue joined and

other qualifications showing the interpretation that the clerk in making up the order put upon the oath. In each of the cases, however, the court held that this recitation was only explanatory, and did not undertake to recite the oath actually administered, and was not, therefore, sufficient to overcome the positive declaration that the jury was duly sworn, particularly in view of the fact that it did not appear that any objection was made to the form of the oath at the time it was administered.

The defendant's next contention is that the venue was not properly proven. There is no merit in this contention. The evidence of the boy's uncle shows that he observed the condition of the child in the city of Huntington, which is in Cabell county, West Virginia, and the other witnesses all testified that the McDonie home in which it is claimed the crime was committed was in the city of Huntington. While they do not specifically state that the city of Huntington that they refer to is in Cabell county, still they do show that it is the same city referred to by the boy's uncle who testified in the case, thus conclusively showing that all of the transactions occurred in Cabell county. Further than this, we take judicial notice of the fact that the city of Huntington, West Virginia, is in the county of Cabell, and is the county seat thereof. *State* v. *Hensley*, 86 W. Va. 434.

The next ground relied upon by the defendant for reversal of the judgment is the action of the court in refusing to strike out certain evidence of Mrs. C. H. Vie, Mrs. Frank Williams, and Mrs. Cora Gill, upon the ground that their evidence did not connect the defendant with the occurrences testified to by them. Mrs. Vie testified that on one occasion in the week before the occurrence which resulted in the arrest of McDonie she heard the child screaming and being very severely chastised; that this was just a few days before the 21st of August; that it was in the nighttime, and that her husband was present. She does not testify that she heard McDonie's voice in connection with the transaction, but her husband testified in relation to the same occurrence, and he says that he heard a man's voice in connection with the whipping that the child was receiving, and that the voice sounded like McDonie's.

This was sufficient to connect the defendant with this transaction. Of course, the probative force of it was for the jury. Mrs. Williams, who lived in an adjoining house, also testified that just previous to the time McDonie was arrested she heard the child's cries and a noise indicating that he was being punished in some way in connection with water running in the bathtub, and that she heard Mr. McDonie's voice in connection with the transaction, but she could not distinguish anything he said. Mrs. Gill, who is the mother of Mrs. Williams, testified to this same occurrence, and while she did not say that she recognized the voice of McDonie, the fact that her daughter did is sufficient to admit her evidence as corroborative of the statements of her daughter as to what transpired.

The action of the court in refusing to strike out certain statements made by Tom Harrison and John Coon is also relied upon for reversal. Harrison was one of the police officers who went to the McDonie home upon the occasion that the child was taken to the hospital. He testifies to finding the child in bed, and to its condition, and testifies to finding the mother in a back room in the dark, and throwing a light on her and asking her what she was doing there. Coon also testifies to this same state of facts. The objection of the defendant goes to the action of the court in allowing the statements of Harrison and Coon as to finding the mother in an adjoining room to remain in the record. We see no objection to this. It perhaps, had little if any probative force in connection with the case, but they were only detailing the conditions which they found in the house at the time they went there and removed the child. They told about finding the child in bed, about the condition of the bed, and the room in which the child was, and about the mother being in an adjoining room in which there was no light. It would, perhaps, have been more significant of bad conduct on the part of McDonie and his wife if no one at all had been found in the house. We do not see how it could in any way prejudice the defendant for these witnesses to testify to the fact that the child's mother was in an adjoining room at the time the child was removed.

The defendant's counsel earnestly insist that the court committed error in refusing to give instuction No. 6 offered on behalf of the defendant. This instruction is as follows: "The jury are hereby instructed that before you can legally convict the defendant of a felony you must believe from the evidence, beyond all reasonable doubt, that the defendant committed the act complained of with intent to maim, disfigure, disable or kill, and unless you believe the defendant committed the act complained of intending at the time to maim, disfigure, disable or kill the said James Gibson then you should acquit him of malicious or unlawful wounding.

"You are further instructed that to maim is to deprive a person of some member of the body; that to disfigure is to impair or injure the beauty, symmetry or appearance, or to render unsightly or misshapen; that to disable is to cripple or to render incapable of proper or effective action, and to kill is to deprive of life, and before you have a right to convict the defendant you must believe two things beyond all reasonable doubt, and such belief must be produced from the evidence: First, that the defendant maliciously or unlawfully did the things complained of in the indictment. Second, That the acts were done with the intent to maim, disfigure, disable or kill, and unless you do believe both things from the evidence beyond all reasonable doubt, you should find the defendant 'Not Guilty' of either malicious or unlawful wounding."

It will be noted that in this instruction an attempt is made to define the terms, "maim", "disfigure," "disable," and "kill," and it is true that no other instruction was given in the case which does define these terms. All of the other elements of the instruction are covered by other instructions given on motion of the defendant. Counsel for the defendant insists that the defendant was entitled to have these terms defined to the jury; that they are words of technical signification, and that the jury might not know just what was comprehended within their meaning. We agree with this contention. It is true, these words do have a technical signification, but we do not believe that this technical meaning is very much different from the meaning ascribed to them by

the average person. However this may be, the defendant was entitled to have the jury told what these terms meant in the indictment in this case as distinguished from the ordinary or colloquial significance which attaches to them. But when the defendant seeks to define these terms he must do it correctly and accurately. He cannot complain of the refusal of the court to give to the jury a definition unless that definition is accurate. Now this instruction tells the jury that to maim is to deprive a person of some member of the body. This, no doubt, is the popular meaning ascribed to this term, but it is not the technical meaning, and it was this technical meaning that the defendant complains that he was not allowed to have given to the jury. The technical meaning of the term maim is, to violently inflict a bodily injury upon a person so as to make him less able to defend himself or to annoy his adversary. 4 Blackstone's Commentaries 206; 6 New Oxford English Dictionary, 260. It may be said that it is technical to justify the refusal of this instruction for the failure to properly define this term. The answer to this criticism is that the defendant's only contention of his right to have it defined is because it is a technical term and has a technical meaning. The definition as given tells the jury that in order to maim it is necessary to deprive one of some member of his body. This is not so at all. To so injure a fighting member of the body that it cannot be used, or cannot be used as effectively as it could theretofore, is as much maiming as it is to entirely sever the member, and when we consider this instruction in connection with the facts proven in this case the vice of this definition at once appears. The principal offense alleged against the defendant was the scalding of the boy's feet. This might not result in the boy losing his feet, or either of them, but it can very well be seen that it might result in them being of less use to him in repelling or making an attack. In fact, the nurse says that if he had not received attention when he did the toes of one of his feet would have grown together. This would not have been maiming under the definition given of this word in the instruction, but it would in fact be maiming in the legal sense of the term.

Complaint is also made of the action of the court in re-
fusing to give instruction A and instructions Nos. 1 and 4.
Instruction A and instruction No. 1 are mandatory. In-
struction No. 4 which was refused is in effect mandatory.
All of these instructions would have compelled an acquittal
of the defendant, and that was their purpose. They are at-
tempted to be justified on the theory that this defendant
stood in the position of a parent to this child, and that no
malice or wrongful intent could be attributed to him from the
fact alone that defendant chastised or corrected the boy.
This contention is quite correct. A parent, or one standing in
*loco parentis*, has the authority to administer chastisement
or correction to his child. The moral sense of children is
not sufficiently developed in all cases to admit of a successful
appeal to the child to desist from wrongdoing without the
aid of physical coercion, but it has never been recognized that
this chastisement or correction could go beyond what the
child's reasonable welfare demands. It has never been rec-
ognized that a parent has the right or power to maim or
disfigure or disable a child simply because he might be stub-
born, and not respond to correction in the manner the par-
ent might think proper. It is true, in this case, no malice can
be attributed to the defendant from the mere fact that he ad-
ministered correction to this child, nor can any criminal in-
tent be attributed to him from the fact alone, but when his
conduct exceeds the bounds of chastisement and goes to the
extent of actually endangering the child's life or limb, then
proof showing these facts is just as effectual to prove malice
and criminal intent as proof of an unjustifiable assault is in
any other criminal case. The doctrine that one intends to do
that which is the natural and probable consequence of his acts
is just as applicable in a case like this as in any other sort of
a case. The proof of chastisement, however, in order that
any presumption or inference may arise therefrom as to
malice or intent, must show that such chastisement has been
administered beyond any real or apparent necessity. A
parent can no more commit a brutal attack upon his child
resulting in the infliction of serious injury upon it, than he
can commit such injury upon a stranger, and when he does

so, and the jury is satisfied that the punishment inflicted has resulted in such serious injury, such fact, when found, may be treated as proof of malice upon the part of such parent as well as of a guilty intent.

The action of the court in admitting in evidence certain clothes and bandages which were offered by the state is also assigned as error, it being insisted that these articles were not sufficiently identified. The evidence in regard to them is that after the defendant and his wife were arrested and taken to jail the police officers went back to the room where they had found the boy, and there found a suit of underwear apparently belonging to the boy and some bandages which had upon them stains, whether from blood or salve which had been used on the wounds does not appear. These garments were admitted in evidence. It is contended by the defendant that because they were not discovered when the officers were there on the first occasion and took the boy away they are not sufficiently identified to permit their admission as evidence. It appears that the officers went back to the house within a very short time, not more than an hour or two after the first occasion, and procured these articles. Why they did not see them and procure them when they were there before does not appear, nor is it material so far as their admissibility as evidence is concerned. It may go to the question of their weight as evidence, but not to their admissibility. They bore all the earmarks of genuineness, and were introduced for the purpose of showing the stains upon them. Whether those stains were made by blood or by the salve which the defendant says was applied to the wounds, or both, was a question for the jury, and that tribunal was entitled to give to them such probative force as in their judgment they might be entitled to after an examination of them.

We have carefully reviewed this case, and have considered maturely every objection raised by the defendant to the action of the court during the trial. There was no undue haste in forcing him to trial, and while the occurrence created strong feeling against him in the city of Huntington where he lived, the officers of the state charged with the administration of justice, upon his application, removed his case for

trial to another county where the influence of this feeling would not be felt. His trial was had several months after the occurrence. The learned Judge of the trial court was apparently solicitous to afford to the defendant every privilege to which he was entitled; he had the aid of eminent counsel in his defense, and the jury, after consideration, found him guilty of a very infamous crime, the like of which has not stained the criminal annals of this state, and finding that he has been given this fair and impartial trial with this result, we must refuse to disturb the judgment and permit him to suffer the punishment to which his conduct, as interpreted by the verdict of the jury and the judgment of the trial court, has condemned him.

*Affirmed.*