Argued April 17; affirmed May 27, 1941

# TREVATHAN *v.* MUTUAL LIFE INSURANCE CO. OF NEW YORK

(113 P. (2d) 621)

Before KELLY, Chief Justice, and RAND, BAILEY and LUSK, Associate Justices.

*Borden Wood*, of Portland (McCamant, Thompson, King & Wood, of Portland, on the brief), for appellant.

*George Black, Jr.*, of Portland (Platt & Black, of Portland, on the brief), for respondent.

RAND, J. On May 10, 1937, the Mutual Life Insurance Company of New York, the defendant herein, issued a policy in the sum of $1000 on the life of Clarence E. Trevathan, the husband of the plaintiff, in

which she was named as beneficiary. The policy was in the form of an annual dividend, ordinary life policy, providing for the payment of double indemnity in case of the death of the insured by accident. The insured died on April 15, 1939, from injuries received in a collision between a motorcycle driven by him and a truck. On notice of the insured's death, the defendant paid to the plaintiff the sum of $1000 but declined to pay the double indemnity, then and now contending that the insured met his death while engaged in the commission of a felony, and that his death was not accidental within the meaning of the policy. Plaintiff thereupon brought this action to recover the additional $1000 and, from a judgment in her favor, the defendant has appealed.

The particular provisions of the policy upon which the defendant relies are as follows:

"The double indemnity will be payable upon receipt of due proof that the Insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes, * * * provided that the double indemnity shall not be payable if death resulted directly or indirectly * * * from committing an assault or felony; * * *".

The only evidence offered by either party showing the circumstances which had occurred just prior to the happening of the accident is contained in a stipulation entered into on the trial that, if one H. C. Diamond was called as a witness for plaintiff, he would testify as follows:

"I am a sergeant in the Vancouver, Washington, police force and, at about 11:30 p. m. on April 14, 1939, was operating a police car in Vancouver accompanied by officer C. W. Friauf. We arrested said Clarence Edgar Trevathan, Jr., who was riding a motorcycle

with a young man named Haag as passenger, for passing a stop button and exceeding the speed limit, and took them to the police station. I there fixed Trevathan's bail at $15.00. He was unable to put this up so I took the keys from the motorcycle, which was parked at the curb opposite the police station, thereby locking the ignition and lighting system and told him that the motorcycle was impounded and he could not take it until he put up the bail. A few minutes later Officer Friauf and I heard the motorcycle start and soon afterward, as we were driving west on First Street between Main and Washington Streets, Trevathan passed us on the motorcycle and started south across the Interstate Bridge. We pursued him and tried to get him to stop but instead of doing so he continued across the bridge at a high rate of speed according to our speedometer, between 85 and 90 miles per hour. We were alongside him until a point on the bridge between Hayden Island and the Oregon mainland, where we slackened our speed to enable him to pass a car he was overtaking driven by G. F. Repsinski of Portland, Oregon, which he otherwise would have been unable to avoid striking. He passed this car and, as he approached the intersection of Swift Road and the bridge approach road, our car was perhaps 150 feet behind him and Officer Friauf was holding our spotlight on him.

"There is a filling station in the angle between Swift Road and the bridge approach and some gravel had worked out on to the pavement of the bridge approach from this filling station. We saw Trevathan skid in this gravel. As Trevathan approached this intersection a West Oregon Lumber Co. truck also approached it on Swift Road and came to a full stop at the stop button. The driver of the truck then started up again and, hearing our siren, came to a second stop with the rear end of its cab about in line with the stop button.

"There was a second truck a few feet behind this truck on Swift Road. From our observation of Trevathan and his motorcycle it looked as if he first intended

to go by the front end of the first mentioned truck and then changed his mind when it started up from the first stop, or was unable to carry out this intention because of loss of control of the motorcycle due to the gravel on the pavement, and tried to pass it in the rear. Probably he did not expect the truck to stop a second time and I think it is possible that had it not done so he might have been successful in passing to the rear of the truck. As it was, however, he was unable to avoid the collision and struck the side of the truck at a point near the left rear wheel, thereby sustaining injuries which resulted in his death later that night.

"I think the accident was caused by a combination of the speed at which Trevathan was travelling, the loose gravel on the pavement near the point of collision, the fact that the truck stopped, started up, and then stopped again, and perhaps also the fact that it was followed by the other truck which there was a possibility that Trevathan might strike if he succeeded in missing the first one; also probably by Trevathan being confused by the danger in which he unexpectedly found himself."

Considered in the light of the testimony which it was stipulated would be given by Diamond if produced as a witness, it is clear that the insured was not engaged in the commission of a felony at the time he received the injuries which caused his death.

■■ Larceny is the unlawful and felonious stealing, taking and carrying away of the personal property of another, of some value, with felonious intent on the part of the taker to deprive the owner of his property permanently. It is said that this description includes all essential elements of the crime of larceny. See note, 2 Wharton's Criminal Law, 12 ed., section 1097. It is, of course, elementary that a man cannot be convicted of stealing property of which he is the absolute owner, but it is also well settled that, if personal property in

the possession of one other than the general owner by virtue of some special right or title is taken from him by the general owner, such taking is larceny if it is done with the felonious intent of depriving such person of his rights, or of charging him with the value of the property. See note, 58 A. L. R., p. 331, and cases there cited. Thus, one having the property in goods may be guilty of stealing them from one to whom he has given them in custody as special possession, as in the case of a lawful lien, pledge, bailment or levy of legal process. 2 Wharton's Criminal Law, 12 ed., section 1177.

■ In the instant case, it is admitted that the insured was the absolute owner of the motorcycle and that the offense for which he was arrested was "passing a stop button and exceeding the speed limit" within the city of Vancouver, Washington. There is no statute of the state of Washington, nor is there any ordinance of the city of Vancouver, so far as shown, which conferred upon any arresting officer the right to impound a motorcycle for that offense, or to accept it as security for bail. The only statute of that state to which our attention has been called, which authorizes the impounding of a motor vehicle of any kind by an officer making an arrest, is section 6360-12, Rem. Rev. Stat. That statute makes it unlawful to operate a motor vehicle not equipped in the manner required by law, or the equipment of which is not in a proper condition. It further provides that if the equipment of such vehicle is defective "in such a manner that it may be considered unsafe", it "may be prevented from further operation until such equipment defect is corrected", and that any peace officer may impound it until it has been placed in a satisfactory condition. It is clear that this statute does not give the impounding officers anything like a

property right in the vehicle. The purpose of the statute is to prevent the operation of such vehicle until repaired and, when so impounded, the impounding officer has no actual financial or property interest in the impounded article either as security for some indebtedness or otherwise. Hence, the retaking of his own motorcycle by the insured, under the circumstances testified to by the officer, was not larceny nor did it amount to a felony.

■ It is also clear that the officers who arrested the insured had no authority to admit him to bail or to accept either cash or property in lieu of bail. As said in 8 C. J. S., Bail, section 38:

"Admitting to bail or allowing bail is, of course, an entirely different act from the taking, accepting, or approving of bail after its allowance; the former, as will be seen infra section 39a, is generally considered to be a judicial act to be performed by a court or judicial officer while the latter is merely a ministerial function which may be performed by any authorized officer."

Again, in section 52, id., it is said:

"In the absence of statute conferring such right a magistrate or officer has no authority to accept a cash bail or a deposit of money in lieu of bail."

See also 6 Am. Jur., Bail and Recognizance, sections 69 and 70.

■■ The power to fix bail is a judicial power and, in the absence of statute, is one which is vested exclusively in the courts. The only Washington statute applicable thereto, to which our attention has been called, is section 2089, Rem. Rev. Stat. In construing this statute, the Washington supreme court held, in *Kellogg v. Witte*, 107 Wash. 691, 182 P. 570, that, in the absence of a statute, a justice of the peace had no authority to

accept cash bail, and, in *Lee v. Severyns,* 151 Wash. 403, 276 P. 94, it was held that the fixing and acceptance of cash bail by the chief of police of Seattle was illegal. From this, it follows that the arresting officers had no authority to fix the amount of the insured's bail or to accept any personal property in lieu of bail, and that their action in respect thereto was illegal and void and vested in them no right, title or special property in the motorcycle.

Nor do we find any merit in the contention that the insured did not die "as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes". The testimony shows that the insured was 21 years and two months of age when he met his death; that he was married and lived in Portland; that earlier in the evening he had left his home, stating to his wife that he was going for a ride and left his home for that purpose; that when returning, he was arrested in Vancouver, and the keys of his motorcycle taken from him on a charge that he had passed a stop button and was driving at an excessive rate of speed, but was not placed under any personal restraint other than as above stated. From these circumstances, it seems obvious that the insured's intention, in retaking his motorcycle, was to return to his home and that he had no reason to anticipate that he would be subjected to any unusual or extraordinary danger in so doing. However, when he was being pursued by the Washington state officers at a highly dangerous rate of speed with their siren blowing and their spotlight fixed on him, he naturally increased his speed in order to escape being again arrested. He had no reason to expect that the loaded truck, which stopped before passing through

the intersection over which he was about to travel, would start up and again stop, blocking his passage, nor did he have any reason to anticipate that, because of loose gravel on the highway, he would lose control of his motorcycle and come into collision with the loaded truck. Moreover, the arresting officers had no right to pursue the insured into Oregon, since no felony had been committed. Section 26-1541, O. C. L. A., limits the authority of officers of another state to pursue and make an arrest in Oregon to cases where the person is fleeing from arrest and "is believed to have committed a felony in such other state". It was held by the supreme court of Washington in *Van Riper v. Constitutional Government League*, 1 Wash. (2d) 635, 96 P. (2d) 588, 125 A. L. R. 1100, that a violation of traffic laws, in failing to stop before entering a street intersection and in driving at an excessive rate of speed, is not a criminal violation of law within an exception contained in a policy that there should be no liability for "death due to acts committed in criminal violation of law". Hence, the officers, in attempting to arrest the insured in Oregon, had no reason to believe that he had committed a felony in the state of Washington and, therefore, had no authority to pursue him beyond the Washington state line. But for such unauthorized and illegal pursuit, together with the loose gravel upon the highway and the movement of the loaded truck, which blocked the highway, any one of which may be said to have caused the accident and none of which he had any reason to anticipate when he repossessed himself of his motorcycle, the insured would not have been killed.

This case, therefore, does not come within the rule that death inflicted during the commission by insured of a voluntary or intentional act is not by accidental

means, if the result was inevitable and could have or should have been foreseen.

■ The policy contains no definition of the word "accidental". The word, therefore, should be given its ordinary, usual, and popular signification or meaning, as indicating an event which takes place without one's foresight and expectation, and is not the natural and probable consequence of an ordinary or common act, as distinguished from an event the occurrence of which involved no element of chance or unexpectedness. Couch on Insurance, section 1137. Webster's Unabridged Dict., title "Accident", defines the word "accident" as "an event which takes place without one's foresight or expectation; an event which proceeds from an unknown cause, and, therefore, not expected; chance, casualty, contingency". The word "accident" has also been defined as any event happening without any human agency, or, if happening through human agency, an event which, under the circumstances, is unusual and unexpected to whom it happened, and took place without the concurrence of the will of the person by whose agency it was caused. See *Hanley v. Fidelity & Cas. Co.*, 180 Iowa 805, 161 N. W. 114; Couch on Insurance, section 1137.

■ The policy provides that double indemnity shall be payable "upon receipt of due proof that the Insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes". That the insured died as the direct result of his collision with the truck is admitted, but it is contended that, since he was driving voluntarily and intentionally at a highly dangerous rate of speed, his death was not caused by accidental means, independently and exclusively of all

other causes. "Accidental means" is used in a contract of insurance in its common significance of happening unexpectedly without intention or design. *Bohaker v. Travelers Ins. Co.*, 215 Mass. 32, 102 N. E. 342, 46 L. R. A. (N. S.) 543.

"* * * 'Accidental means', as used in an insurance policy, signifies a happening by chance and without intention or design, which happening is unforeseen, unexpected, and unusual at the time it occurs. * * * The authorities are agreed, however, that whatever the rule as to death or injuries resulting from the voluntary act of the insured, where the death or injury is caused by some act of the deceased or insured not designed by him, or not intentionally done by him, it is death or injury by accidental means." 29 Am. Jur., Insurance, section 933.

"It is generally held that death or injury does not result from accident or accidental means within the terms of an accident policy where it is the natural result of the insured's voluntary act, unaccompanied by anything unforeseen, except the death or injury. Where, however, the death or injury is not the natural or probable result of the insured's voluntary act, or something unforeseen occurs in the doing of the act, the death or injury is held to be within the protection of policies insuring against death or injury from accident and is by some courts held to be within the protection of a policy insuring against death or injury produced by or resulting from accidental means. According to this view, if in the act which precedes the death or injury, although an intentional act, something unforeseen, unexpected, and unusual occurs which produces the death or injury, it is accidentally caused or results from accidental means. On the other hand, a number of courts draw a distinction between 'accident' and 'accidental means', on the theory that although the result of an intentional act may be an 'accident', the act itself, that is the cause, where intended, is not an 'accidental means'. This line of cases holds that, where an unusual

or unexpected result occurs by reason of the doing by the insured of an intentional act where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means, that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen. But whether or not it is deemed that a death or injury by accidental means may be produced by a voluntary act, it is clear that if death or injury results from an act not designed or intended by the insured, it is a death or injury by accidental means.'' 29 Am. Jur., Insurance, section 941.

That it was negligent for the insured to drive his motorcycle at a dangerous rate of speed may be conceded but negligence alone is not sufficient, under the terms of this policy, to defeat the liability of the defendant. The general rule applicable thereto is stated by Couch on Insurance, section 1138, as follows:

''* * * as a general rule, and the better one, the negligence of an insured will not defeat liability on a policy insuring against bodily injuries resulting from accident or accidental means, even though such negligence contributed thereto; at least if the result was not one the insured anticipated, or could reasonably have anticipated, and which he had no intention of producing; and this, even though his negligence was gross, and provided the policy does not expressly stipulate against liability for negligence or wilful exposure to danger, etc.''

Again, as said in 29 Am. Jur., Insurance, section 942:

''Recovery on an accident insurance policy is not defeated by the mere fact that negligence of the insured contributed to the injury, unless the policy expressly excepts from the risk accidents due to the negligence of the insured.''

■ Under the terms of this policy, it is clear that the doctrine of proximate or remote causes, as applied in negligence cases, is not applicable to any of the questions involved here, since, regardless of whether the insured may have been negligently driving when he sustained the injuries which caused his death, such negligence, if there was such, will not relieve the defendant from its liability under the double indemnity clause, nor make the death of the insured one not caused by "accidental means, independently and exclusively of all other causes", within the meaning of the policy. See Cornelius on Accidental Means, 2 ed., pp. 131 and 132, and cases there cited.

There are other assignments of error referred to in defendant's brief but none of them, in our opinion, constitutes reversible error.

■ The judgment must, therefore, be affirmed and, upon its affirmance, the plaintiff, under section 101-134, O. C. L. A., becomes entitled to an additional attorney's fee upon this appeal. She was awarded an attorney's fee of $350 in the trial of the cause in the court below. Taking this into consideration as well as the amount involved herein—$1000 and interest for a short period of time—we are of the opinion that an attorney's fee of $450 for the services rendered in both courts is reasonable. It is, therefore, hereby ordered that an additional attorney's fee of $100 be allowed to the plaintiff for the services performed in this court.

Judgment affirmed.