STATE OF WEST VIRGINIA

*v.*

FRANK A. PIETRANTON

(No. 10474)

Submitted September 24, 1952. Decided October 14, 1952.

BROWNING, JUDGE, not participating.

*John G. Fox*, Attorney General, *Thaddeus D. Kauffelt,*

*Arden J. Curry,* Assistant Attorneys General, for plaintiff in error.

*Margiotti & Casey, Schuck & Blumenberg,* for defendant in error.

GIVEN, JUDGE:

At the March, 1951, term of the Circuit Court of Brooke County, defendant, Frank A. Pietranton, was indicted for having fraudulently obtained a check from Eugene James Iacuone in the amount of $2,833.33. A demurrer to the indictment was overruled and a verdict of guilty was returned by the jury, and, a motion to set aside the verdict having been overruled, defendant was sentenced to serve an indeterminate sentence of one to five years in the state penitentiary.

In so far as material here, the indictment charged that defendant feloniously and falsely pretended and represented to Iacuone that it was necessary for Iacuone to endorse his, Iacuone's, name on a certain "bank-check", issued and signed as maker by defendant, payable to the order of Eugene James Iacuone, and that defendant fraudulently pretended it was necessary for Iacuone to return the check, after having endorsed it, to the defendant. The indictment further charges that "* * * by means of which fraudulent and false pretenses the said Frank A. Pietranton did then and there feloniously and unlawfully obtain the said paper writing of value, to-wit: the said negotiable instrument, commonly called a 'bank check' issued and executed by the said Frank A. Pietranton on December 8th, 1949, payable to the order of Eugene James Iacuone, in the amount of Two Thousand Eight Hundred Thirty-three and thirty-three one hundredths ($2,833.33) Dollars, with the endorsement thereon of the said Eugene James Iacuone, which check was given to the said Eugene James Iacuone as aforesaid by the said Frank A. Pietranton, as attorney for the said Eugene James Iacuone, in partial payment of money collected by the said Frank A. Pietranton, as such attorney for Eugene James Iacuone,

of the property, goods, and chattels of the said Eugene James Iacuone, against the peace and dignity of the State."

Defendant, an attorney at law, had been employed by Iacuone to represent him in the prosecution of a claim growing out of an automobile injury, wherein Iacuone was seriously injured. After having done certain work in connection with the prosecution of the claim, and after having instituted an action in connection therewith, defendant employed Frank A. O'Brien, an attorney at law, to assist in the further prosecution of the action. After the date fixed for trial, and after certain negotiations between defendant and O'Brien, representing Iaucone, and the attorney representing the insurance company supposedly liable, a compromise was effected whereby $18,-500.00 was paid by the insurance company in settlement of the claim. A draft for that amount was drawn payable to O'Brien, defendant and Eugene James Iacuone. The draft was first endorsed by O'Brien and then delivered to defendant. A release of the claim had been previously executed by Iacuone and delivered to the insurance company. It is over the distribution of the funds represented by the draft that the questions arise.

It is the contention of defendant that he was entitled to receive for his services fifty per cent of the $18,500.00 by virtue of a written contract with Iacuone, which contract, however, was not produced and was claimed by defendant to have been misplaced or lost. Very substantial evidence supports defendant's contention as to the fifty per cent contingent fee. Defendant further contends that his oral arrangement with O'Brien was to the effect that O'Brien was to receive one half of one third of the amount of recovery. O'Brien, testifying at the instance of the State, does not appear to contend that he was to receive any larger proportion of the recovery. The State contends that under defendant's contract with Iacuone, defendant was to receive only one third of the amount of recovery. There is also very substantial evidence supporting the position of the State. In making distribution of the $18,500.00 on December 8, 1949, defendant obtained

the endorsement of Iacuone on the draft and deposited the draft in the fiduciary account of his law firm. Checks were drawn by defendant against that account; one to the order of Eugene James Iacuone in the amount of $9,000.01; one to the order of O'Brien & O'Brien, Attorneys, of which firm Frank A. O'Brien was a member, in the amount of $3,083.33; one to the order of F. B. Harrington, M. D., in the amount of $500.00; and another check to the order of Eugene James Iacuone in the amount of $2,833.33. The indictment relates to the last mentioned check.

It is the contention of the State that defendant falsely represented to Iacuone that to enable him to obtain a compromise of the claim for a sum greater than $10,000.00, it became necessary to pay a bribe to the attorney representing the insurance company, and which bribe was to be one third of the amount of recovery over and above $10,000.00. Defendant contends that the check for $2,833.33 represented the difference between one third of the amount of recovery and one half of the amount of recovery, after deduction of the sum paid to Doctor Harrington, the personal physician of Iacuone, after Iacuone had complained as to excessive expenses, and after defendant had agreed that such amount could be deducted from the amount of recovery, before any deduction as to the amount of the fee due defendant.

There is no question that defendant presented the so called "bribe" check to Iacuone for endorsement; that Iacuone endorsed it; and that by virtue of the check the funds represented by it were transferred from the fiduciary account of defendant to his personal account. Mr. Iacuone testified to the effect that "it was turned over for me to sign by Pietranton and handed back to him." There appears no doubt that the check was delivered by defendant to Iacuone only for the purpose of endorsement. Other evidence will be detailed later in connection with discussions of particular propositions.

The statute, Code, 61-3-24, under which the indictment was drawn, in so far as applicable here, reads: "If any per-

son obtain from another, by any false pretense, token or representation, with intent to defraud, money, goods or other property which may be the subject of larceny, * * * with intent to defraud, he shall, * * * be deemed guilty of larceny; * * *".

In support of the demurrer, defendant contends the indictment shows on its face that he obtained no property capable of being the subject of larceny; that one can not be guilty of larceny of his own check; that Iacuone had no property in the check and lost no property or right through the endorsement; and that the check was of no value, there being in the fiduciary account insufficient funds for the payment thereof, the draft for $18,500.00 not then having been deposited.

Code, 46-16-6, reads: "A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check. See *Mountaineer Engineering Co.* v. *Bossart,* 133 W. Va. 668, 57 S. E. 2d 633. Section 16 of Article 1 of the same chapter reads, in part: "Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto. As between immediate parties and as regards a remote party other than a holder in due course, the delivery, in order to be effectual must be made either by or under the authority of the party making, drawing, accepting or indorsing as the case may be; and in such case the delivery may be shown to have been conditional or for a special purpose only and not for the purpose of transferring the property in the instrument. * * *."

The defendant, before the endorsement, being the maker of the check, and having continued in possession thereof from the time of the endorsement, undoubtedly remained the absolute owner of it. He could have, at any time, destroyed the check without destroying any right or property of any other person. What right or property did he "obtain from another" by the endorsement that would be

"the subject of larceny"? Under the applicable statute, quoted above, no assignment of the funds, supposedly represented by the check, was effected. The defendant obtained no right or title to the funds, and no right to possession of the funds, which he did not previously have. He could have, after the endorsement, destroyed the check and remained in precisely the same position in relation to the funds as he was prior to the endorsement. So would Iacuone have been in the same position as he was prior to the endorsement. The only possible thing that could have been obtained by defendant was the bare endorsement of Iacuone on the check which was and remained the property of defendant, an intangible something, not a subject of larceny. Neither does the fact that defendant actually used the check to obtain a transfer of funds from the fiduciary account to his personal account alter the situation. The transfer could have been effected by him in various other ways, the fiduciary account and the sum deposited therein being under his control and subject to his orders. From these facts, we necessarily conclude that the indictment discloses on its face that the defendant obtained no property by virtue of the endorsement which could be the subject of larceny.

In 52 C. J. S., Larceny, Section 1, larceny is defined as follows: "Larceny, as distinguished from other offenses, is the taking and carrying away from any place, at any time, of the personal property of another, without his consent, by a person not entitled to the possession thereof, feloniously, with intent to deprive the owner of his property permanently, and to convert it to the use of the taker or of some person other than the owner; * * *". No authority has been cited, and we have found none, indicating that a person may be convicted of larceny of his own check before an absolute delivery thereof, or that the obtaining of an endorsement of the check, in the circumstances of this case, is the obtaining of a thing subject to larceny.

In *Trevathan* v. *Mutual Life Ins. Co. of New York*, 166 Ore. 515, 113 P. 2d 621, the Court held: " 'Larceny' is the unlawful and felonious stealing, taking and the carrying

away of the personalty of another of some value with felonious intent on the part of the taker to deprive the owner of his property permanently."

In *State* v. *Luckey*, 150 Ore. 566, 46 P. 2d 1042, the Court held: "Person is not guilty of stealing his own goods if he is entitled to possession of goods at time of taking."

In *State* v. *Moore*, 15 Iowa 412, the Court held that to obtain an endorsement or credit upon a promissory note is not obtaining "property, money or goods within the meaning of the statute." While not in point, the following cases are believed to be of some significance. *State* v. *Crumbey*, 81 W. Va. 287, 94 S. E. 137; *State* v. *Pishner*, 72 W. Va. 603, 78 S. E. 752; *Butts* v. *Commonwealth*, 145 Va. 800, 133 S. E. 764; *Commonwealth* v. *Thomas*, 166 Pa. Super, 214, 70 A. 2d 458; *People* v. *Cassou*, 27 Cal. App. 23, 148 P. 810; *McCuistion* v. *Texas*, 143 Tex. Crim. Rep. 283, 158 S. W. 2d 527, 141 A. L. R. 205.

The conclusion that the indictment charges no crime against the defendant would ordinarily render discussion of other questions unnecessary. This Court is cognizant, however, of the fact that this case is one of a number, some of which are mentioned in the record, which have arisen in the First Judicial Circuit, comprised of Ohio, Brooke and Hancock Counties, involving serious and divers charges against a number of attorneys practicing in that circuit and, to some extent, the two judges presiding over the circuit courts of those counties. In one sense this case may be considered as one of a chain involving such matters. In the circumstances, this Court has felt it a duty to consider other propositions which arose during the course of the trial of this case, and to discuss them very briefly. We do not, of course, intend to discuss or take into consideration any question arising in any other case.

After the jury had been sworn, and after certain evidence had been introduced on behalf of the State, the trial judge requested that all witnesses present, both for the State and the defendant, be sworn. Before the oath was

administered, however, the court admonished the witnesses, in the presence of the jury, as follows:

"Now, before you take the oath, it may be well to apprise those of you who do not appreciate what an oath means. When you come to take it and testify in court you become a part of the administration of justice, and justice cannot be justly administered if witnesses do not take an oath and abide it. When you take an oath in court you hold up your right hand, pointing it toward Heaven, where we generally appreciate the fact that Almighty God, our Creator and final Judge, has his habitation, and you are calling upon Him to be a witness that what you may testify to when called as a witness is the truth, the whole truth, and nothing but the truth, and that you will not withhold anything that is the truth. Now, if there is anyone of you who does not believe in the Divinity whom we call God, don't raise your hand. If you don't believe that you are bound by the obligation you take and your responsibility to Him, as well as to our local tribunal, don't raise your hand.

"This court has already been apprised and lost a whole day in this trial of threats being made, not only to intimidate witnesses, but to try to induce them to tell falsehoods, it being known that such persons were to appear here as witnesses, and there may be a good deal of evidence in this case tending to establish those facts.

"The grand jury of this county, called to act at this term, has appeared here and did their work on the first day of the term. After completing the work then before them they were adjourned or excused subject to call, and I have already been requested that they be notified they are to appear here to hear certain matters which may be necessary for them to hear, probably on next Monday. If this court is of the opinion that any person who has taken this stand has testified falsely, a record of the testimony of such witness shall be certified to that grand jury, and if the grand jury should indict any person for false

swearing or perjury in this case, that person will be promptly tried and if convicted by a petit jury, they may be assured that, if this court is presiding, they will receive a sentence, recommending the maximum penalty. I want everybody to understand that now before they take this oath, and there will be no complaint they did not understand it heretofore, should the occasion arise.

"All right, now, realizing that, those who do believe in their responsibility as outlined will hold up their right hand."

Of special significance, we think, is the part of the quoted statement informing the jury that attempts to intimidate witnesses and induce them to testify falsely had been made; that a day had been lost in the trial of the case in conducting an investigation to determine the truth as to such charges; that the court had been requested to reconvene the grand jury; and that the grand jury would probably be reconvened.

The investigation mentioned in the court's remarks took place in the chambers of the trial judge. A number of witnesses, some of whom later testified in the trial of this case appeared before the judge, were sworn, and gave testimony. The defendant and his counsel were in the court room, but neither the defendant nor his counsel were permitted in the judge's chambers during the investigation. Neither were they permitted to know the purposes thereof until after the taking of much testimony, although counsel for the State took part in the investigation. The jury remained in the court room during the time, or at least a large part thereof, of the investigation. We think it certain, from these facts, and from other facts disclosed during the trial, that the jurors necessarily concluded the investigation related to charges that defendant, or someone in his behalf, had attempted to intimidate witnesses for the State, and had attempted to induce them to testify falsely, and the statement of the court, in effect, advised the jury that the evidence of such attempts

was of such nature as to necessitate the calling of a grand jury.

Defendant argues that the investigation was part of the trial of defendant and, he being absent therefrom, the motion to discharge a juror and declare a mistrial should have been granted. We think there is no merit in the contention. The investigation was not part of the trial. There can be no doubt that a trial court has a right to suspend a trial and make such an investigation. Neither are we of the opinion that the remarks of the court relating to the nature and effect of the oath about to be administered to the witnesses could have resulted in prejudice to the defendant. The further contention is made, however, by defendant that the remarks of the trial judge, in the presence of the jury, to the effect that attempts to intimidate witnesses and to induce them to testify falsely, necessarily prejudiced the jury against the defendant. We agree with this contention. It would seem practically certain, in these circumstances, that the jury would form a fixed opinion of guilt of some wrongdoing on the part of defendant, as to the matter under investigation, or on his behalf and, if by someone on his behalf, would be charged to him nonetheless.

In *Pinn* v. *Commonwealth*, 166 Va. 727, 186 S. E. 169, the Court held: "Where state's witness suggested that principal defense witness had attempted to intimidate him, court's remark in presence of jury that rule should issue against defense witness to show cause why witness should not be attached and punished for contempt in intimidating state's witness *held* prejudicial." In the present matter the charges of attempting to intimidate witnesses and to induce them to testify falsely are more serious than mere contempt. An announcement by the trial judge that a grand jury would be called would be far more impressive to the jury than the announcement that a rule in contempt would be issued.

It appears that a witness named DeFranco, whose evidence is discussed later in this opinion, met Mrs. Iacuone

and conversed with her about the settlement made by defendant with her husband. This conversation occurred more than a year subsequent to the settlement, but after differences arose between the witness and defendant, and about one week before Frank A. O'Brien requested Iacuone to come to his office, where the matter of the settlement was discussed by Iacuone, his wife and Frank A. O'Brien. Mr. O'Brien later called the matter to the attention of the Prosecuting Attorney of Brooke County, and the indictment of defendant was returned shortly thereafter. In his closing argument before the jury, the prosecuting attorney used this language: "This case, as Mr. Frank O'Brien testified, was brought to my attention by him—by Mr. Frank A. O'Brien. Why? Because Mr. Frank A. O'Brien, you can infer, determined that the Iacuones had been swindled. That is the truth about that." After an objection to the remarks the court stated, in the presence of the jury: "The jury can conclude what they were. I think it is a fair interpretation. I can't recall the exact language by the witnesses, but I do think I recall when this statement was turned over by someone, probably Mr. O'Brien, to the Prosecuting Attorney, and the Prosecuting Attorney had told him that he had heard about it just a short time before." This, we think, was prejudicial. The statement had the effect of advising the jury that the statement of the prosecuting attorney to the effect that Frank A. O'Brien "determined that the Iacuones had been swindled" was "a fair interpretation of the evidence of that witness."

Contention is made by defendant that he was unduly limited in the cross-examination of DeFranco, especially with reference to a written statement made, but not signed, by DeFranco. To understand this assignment, we must necessarily point out certain facts disclosed in the record. DeFranco was formerly a member of the Federal Bureau of Investigation, but was employed as an investigator by defendant at the time of the engagement of defendant by Iacuone to prosecute the claim for injury to Iacuone. Later, disagreements arose between defendant

and DeFranco, and they became very embittered toward each other. These differences arose after the settlement of the Iacuone claim, but sometime before the indictment in the present case was returned. As before noted, DeFranco conversed with Mrs. Iacuone concerning the settlement shortly before the Iacuones were requested to appear at the office of Frank A. O'Brien, and shortly before the indictment was made. Sometime later, but before the commencement of the trial, DeFranco met defendant on a street near defendant's office in Weirton, and either renewed, or pretended to renew, friendship with defendant. Thereafter, DeFranco and defendant appeared in the office of Mr. Margiotti, of counsel for defendant, in Pittsburgh, where DeFranco appears to have sought advice as to whether he would be granted immunity as to certain testimony given by him before a grand jury, in connection with a different matter, in the event he should testify as to certain facts on behalf of defendant in the instant case. We must assume, of course, that he would not have sought immunity had the evidence given by him before the grand jury in the other matter not been different from that offered on behalf of defendant in the instant case. While at the office of Mr. Margiotti, a statement of DeFranco, entirely in his own handwriting, but not signed, was handed to Mr. Margiotti by DeFranco, the contents of which tended very strongly to exonerate defendant as to the charge in the indictment. DeFranco was called as a witness by defendant, but his attitude and testimony became so hostile that the court permitted defendant to cross-examine him, and he was confronted with the statement made in his own handwriting, and was requested to indicate, by markings, what parts of the statement were true and what parts were false. But the court, after objection, refused to require him so to do. Numerous other rulings of the court, with respect to the cross-examination of this witness, are complained of, the contention being made that the refusal of the court to permit full cross-examination of the witness amounts to a denial of

a fair and impartial trial, guaranteed to defendant by the State and Federal Constitutions.

We think it clear that defendant was denied the right to fully cross-examine this witness. On the stand the witness appeared arrogant and boastful, especially as to his own ability as an investigator. On numerous occasions he was permitted to answer proper questions evasively, or not at all. At divers times he argued matters with the cross-examiner and, before the jury, accused cross-examining counsel of misconduct in relation to the case. He did not even hesitate to make an objection to the court as to the course of the examination. Apparently to emphasize his own ability or importance, he requested the court to permit Judge Brennan, one of the judges of the First Judicial Circuit, to remain in the court room to hear his testimony. For the most part, all objections to such actions were ignored by the trial court. We may also note that the trial court, more than fifty times, injected itself into the examination of this witness by defendant's counsel, in such manner, and at such times, we believe, as to lead the jury to conclude that the witness was attempting to testify truthfully. Of course, we do not say that such actions were so intended by the trial judge. Such actions were probably due to the extreme tension shown by the record to exist throughout the trial. In these circumstances defendant was entitled to fully cross-examine the witness. We think we need not cite authorities concerning the right of the trial court to properly limit cross-examinations, or the right of a defendant on trial to be accorded a full and fair opportunity to conduct such an examination. The principles are too well known to demand citations.

A large number of instructions were tendered to the court by defendant. All were refused, and the court, in lieu of the instructions offered, prepared a written charge and read it to the jury. See Code, 56-6-19. The defendant offered no instruction dealing specifically with the question as to whether the defendant would be guilty of the crime charged against him if the contract of employment provided for a fifty per cent contingent fee. Neither did

the charge cover that question. During the argument of one of counsel for defendant, who evidently then believed the charge read to the jury covered the point, a statement was made to the jury to the effect that the court instructed the jury that if "the contract was 50 per cent you must return a verdict of not guilty * * *". The court then replied: "I didn't make any such statement." This, we think, had the effect of advising the jury that the position of defendant in that respect was not correct. After the attorney for defendant had completed his argument, but before the prosecuting attorney began his closing argument, defendant moved the court "to instruct the jury if they find the contract was 50 per cent, that then no crime was committed because Frank Pietranton was entitled to $2,833.33." The court immediately announced that it would "refuse to instruct the jury to that effect".

Paragraph (e) of Rule VI of Rules of Practice for Trial Courts, in so far as material, reads: "All instructions to juries shall be reduced to writing and a copy presented to opposing counsel at the conclusion of the evidence. The Court will instruct the jury prior to argument. Supplementary instructions may be given later. * * *."

As before noted, there was before the jury substantial evidence to the effect that the contract of employment provided that defendant should be entitled, for his services, to fifty per cent of any recovery. We think it not disputed that if defendant was, under the contract, actually entitled to fifty per cent of the recovery, he committed no crime in connection with the matter. Therefore, the defense was of extreme importance to defendant, and the jury should have been advised correctly in regard to the same. The State contends, however, that no written instruction covering the point having been tendered by defendant, the court was not bound to cover the point in the charge. The rule, however, permits supplemental instructions to be given, in the discretion of the court, and we perceive no reason why, where as here, the refusal of a supplemental instruction would deny to a defendant a vital defense, the charge should not be amended or a

supplemental instruction given. We think the refusal to do so, in the circumstances, was an abuse of such discretion. The further contention is made, on behalf of the State, that the defendant having failed to offer a written instruction at the time of making the motion, it was not error for the court to refuse to grant the motion. We think, however, that the court's immediate and emphatic announcement that the court refused to "instruct the jury to that effect" rendered the actual preparation and tendering of the written instruction a vain and useless thing.

Another assignment of error is that "The Court's demeanor and conduct throughout the trial was such as to indicate bias and prejudice against defendant which in view of the verdict prejudiced the jury against the defendant." Numerous rulings, statements and actions of the court are pointed to for the purpose of supporting this contention, including some of the matters already discussed. We think sufficient has been said to answer this contention. " 'In the trial of a criminal case the jurors, not the court, are the triers of the facts, and the court should be extremely cautious not to intimate in any manner, by word, tone, or demeanor, his opinion upon any fact in issue.' Pt. 7, Syl., *State* v. *Austin,* 93 W. Va. 704." Syllabus, *State* v. *Perkins,* 130 W. Va. 708, 45 S. E. 2d 17. See also *State* v. *Peterson,* 132 W. Va. 99, 51 S. E. 2d 78; *State* v. *Price,* 113 W. Va. 326, 167 S. E. 862; *State* v. *Hively,* 103 W. Va. 237, 136 S. E. 862; *Dodson* v. *Commonwealth,* 185 Va. 57, 37 S. E. 2d 744; *Mazer* v. *Commonwealth,* 142 Va. 649, 128 S. E. 514.

Assignments of error are also made with reference to certain arguments of the prosecuting attorney, especially as to the failure of defendant to question the witness Ingram as to the general reputation of defendant, after having advised the court that he had been subpoenaed for that purpose. The witness was present at the trial and testified as to other matters. See *State* v. *Mowery,* 115 W. Va. 445, 176 S. E. 851. And an assignment of error was also made as to the admission of certain rebuttal evidence. See *State* v. *Shelton,* 116 W. Va. 75, 178 S. E. 633. Numer-

ous other assignments of error were made, some of which may have merit, but we deem it unnecessary to mention them specifically.

We have not overlooked the contention of the State that no specific objection was made to some of the matters assigned as error. In our opinion, the objections made and exceptions actually saved were sufficient as to most, if not all, of the assignments mentioned in this opinion. Moreover, the defendant's motion for a new trial assigned matters now complained of as grounds supporting the motion. See *Neill* v. *Rogers Bro's Prod. Co.*, 38 W. Va. 228, 18 S. E. 563.

The judgment of the Circuit Court of Brooke County is reversed, the verdict of the jury is set aside, and the case is remanded to that court with directions to sustain the demurrer of the defendant to the indictment.

*Judgment reversed;*
*verdict set aside;*
*remanded with directions.*