338 S.E.2d 405

**STATE of West Virginia**

v.

**Danny Dewayne KELLY.**

No. 16524.

Supreme Court of Appeals of West Virginia.

Dec. 19, 1985.

---

Hardman & Powell, J.C. Powell, Parkersburg, for appellant.

Harvey G. Deitzler, Pros. Atty., John Ernest Shank, Asst. Pros. Atty., Parkersburg, for appellee.

**PER CURIAM:**

Danny Dewayne Kelly was indicted for grand larceny and convicted by a jury of petty larceny in the Circuit Court of Wood County. In urging that his conviction be reversed on appeal, Kelly contends that the trial court erred in not granting a judgment of acquittal on the basis that the evidence did not prove beyond a reasonable doubt that his conduct was committed with criminal intent. Finding merit in this argument, we reverse and remand with directions.

Robert Gross and Kelly were charged in a joint indictment with stealing ten oak mantels having a value of more than $200 from two houses located in Parkersburg in April, 1983. The defense admitted that Kelly arranged for the sale of the items, but contended that he had done so at the request of one James Bradley, who he believed owned the houses. As the evidence developed, a James D. Bradley was married to one of the property owners at the time the property was taken.

The two owners of the victimized residences testified for the State along with six other witnesses. Linda Bradley, a real estate broker, testified that she and Russell Wilson had formed a general partnership named "Ruslind Rehabilitation." Its purpose was to purchase and restore three unoccupied houses for use as rental property located on Avery Street in Parkersburg, West Virginia. The partnership purchased the two-story duplexes from an estate in January, 1983, for $5,000. The City of Parkersburg had been seeking to have the houses either demolished or repaired for some time and had given the owners a July, 1983 deadline to comply with the city's code. The houses were damaged by vandalism in January and February, 1983, and efforts to prevent further destruction, such as nailing the doors shut proved largely unsuccessful. Large oak mantels with beveled glass mirrors were present in each of the houses. Some of the mirrors were broken during this time period.

Ms. Bradley testified that one Wednesday in April she had gone through the houses and found everything in place, including the mantels, after she had driven by and noticed one of the doors was standing open. When she returned the following Monday, April 25, 1983, two of the houses had been vandalized again. Locks had been torn off the front doors, windows had been broken, window frames had been torn out of the walls, staircase rails had been torn out and demolished, and two of the oak mantels had been pulled off the

walls and left on the floor. The remaining ten mantels were missing.

The next day she and the other owner, Russell Wilson, in the company of a law enforcement officer identified the mantels at Maher's Antique Shop in Parkersburg. Photographs of the mantels taken at the shop were introduced in evidence. Ms. Bradley testified that she did not know either the defendant or his coindictee, Robert Gross, and had never given either of them permission to remove the mantels from the houses. On cross-examination, she testified that she had been married to a James D. Bradley at the time of the alleged grand larceny, but had since obtained a divorce.

The other owner, Russell Wilson, corroborated Ms. Bradley's testimony and also stated that he did not know the defendant or his coindictee in April, 1983, and had never given either of them permission to remove the mantels. Dale Michaels, who lived on Avery Street where the houses are located, testified that on a Wednesday afternoon in April he had walked by the house, heard noises, and noticed that a truck was parked there with mantels stacked in the back. He stopped and shortly thereafter a person came to the door with a crowbar in his hand and waved at him. He also saw another man at the back of the house, but did not see him well enough to identify him. On cross-examination, he said that the two people in and around the house made no attempt to hide or conceal their presence.

Robert Casto, the owner and operator of a new and used furniture store in Parkersburg for about two years, testified that Kelly and the coindictee Robert Gross had come to his store trying to sell materials from the two houses. Kelly told him the property was going to be torn down and burned. Although Casto was not interested initially, he agreed to go look around. He and his hired helper, Charles Taylor, then went with Kelly and Gross to the houses. Casto inquired about whether the mantels were for sale because he knew an antique dealer who might buy them. When the defendant responded that the mantels were worth $20 to $30 a piece, the four of them left. Later that day Casto contacted Robert Maher, of Maher's Antiques in Parkersburg, who expressed an interest in buying the mantels. After he and Maher returned to the houses, Maher agreed to buy the mantels, provided someone would remove and deliver them.

When Kelly returned to Castro's store a short time later, Casto offered to buy the mantels if Kelly and his friend would help remove them. They agreed and he then paid Kelly $140. On cross-examination, Casto testified that when he went to inspect the houses for items having possible salvage value, the front door on one of the houses was open and the front door on the other house had been removed from its hinges. He also stated that when Kelly returned to his store the second time and he agreed to purchase the mantels, Kelly said he would have to make a phone call to make certain that it was all right to accept the money. Kelly then made three phone calls from the store. The first two times Kelly said he could not get an answer. On his third attempt, Kelly talked on the phone.

Charles Taylor testified that he had gone with Kelly and Gross to the houses to remove the mantels, but that as soon as they arrived Kelly left, and Gross left about a half hour to forty-five minutes later. He also stated, however, that two or three of the best mantels were removed while both Kelly and Gross were present. He loaded the mantels onto the back of his truck with the help of another man he had contacted and delivered them in two trips to Maher's Antiques. On cross-examination, Taylor confirmed the testimony that Kelly had made two or three phone calls from Castro's store. He stated that they carefully removed the mantels so as not to damage them, but that some of them were already damaged.

Robert Maher corroborated Casto's testimony concerning his purchase of the mantels and testified based on his experience as a dealer in antiques that the mantels as a group were worth around $600 to $650. A police officer for the City of Parkersburg

testified that he saw Kelly and another man apparently loading mantels into the back of the truck, but did not stop and make any inquiry as it was not apparent that anything illegal was taking place. He estimated there were from two to four mantels in the back of the truck. A second officer confirmed this testimony and the prosecution rested its case. The defense then moved for a judgment of acquittal which was denied.

The defense called a Nellie Bohn who testified that Kelly had come to her door sometime in April and had asked who owned the houses across the street. She told him that she did not know, but had frequently seen Linda Bradley working over there. Not long thereafter and perhaps on the same day, he came to her house again and asked to borrow a screwdriver.

Robert Gross testified that Kelly approached him on a Tuesday or Wednesday in April about tearing down some houses on Avery Street. They went to take a look at the houses and when they arrived, a man who introduced himself as Jim Bradley was present. Kelly and Bradley talked about the price for tearing down the houses. After a few minutes, he and Kelly removed a few items of old furniture from the house and put them into Bradley's truck. The next day the mantels were sold and the following day they saw James Bradley walking down Seventh Street in Parkersburg. Kelly then paid Bradley the money he had received from the sale of the mantels to Casto. Bradley then gave Kelly $40 for arranging the sale, which the two of them split.

On cross-examination, Gross testified that he had helped Kelly on other odd jobs and that Kelly told him that Bradley owned the houses. He and Casto's helper removed the first two mantels from one of the houses and Kelly did not assist in the removal because he has a paralyzed hand. He testified that the mantels were removed from the houses two days after Kelly received a telephone call on a phone he was using to receive messages about employment.

Kelly took the stand and testified that he was a self-employed contractor who did painting, both interior and exterior, and would essentially take any job that he could get, including tearing down houses. In April, he had placed an advertisement for construction and demolition work in the Parkersburg Bulletin Board. A Bulletin Board containing his advertisement was introduced in evidence. He was living with his aunt in Parkersburg at the time and had listed her telephone number in the ad because he could not afford a telephone. In response to the ad, his aunt received a telephone call while he was out working in the garage and wrote down the phone number of the caller on the top of a copy of the Bulletin Board, but neither this copy nor the phone number were introduced into evidence at trial.

He recalled that the number began with the exchange 423, a Belpre, Ohio telephone exchange, but he could not remember the remaining four numbers. He said he returned the call and agreed to meet James Bradley on Avery Street where he, Bradley, and Gross discussed tearing down the houses. They were supposed to meet again at the houses the next morning, but Bradley did not show up. The next day, however, he met Bradley on Avery Street and after a brief discussion he and Gross went to see Casto to determine if he might be interested in buying any of the salvageable items or lumber out of the houses. Casto did not seem interested at first, but agreed to go look.

Kelly corroborated Casto's testimony and admitted that Casto had arranged the sale and paid the defendant $140. He testified that Ms. Bohn told him the Bradleys owned the houses. He also stated that he provided no physical assistance in moving the mantels because of his paralyzed hand, but did grab the corner of one to keep Gross from dropping it while he was placing it in the truck.

He said that three days after the sale, he happened to run into Bradley, paid him the $140, and was paid $40 for his efforts in arranging the sale, which he split with Gross. He has not seen Bradley since that

time, and has since lost his phone number. In summary, Kelly admitted that he made arrangements to sell the mantels to Casto and that he received money for them. He was present when the work was begun to remove the mantels and left after the first mantel had been loaded on the truck.

Our common law definition of the crime of larceny is stated in Syllabus Point 3 of *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981): "To support a conviction for larceny at common law, it must be shown that the defendant took and carried away the personal property of another against his will and with the intent to permanently deprive him of the ownership thereof." *See also State v. Houdeyshell*, 174 W.Va. 688, 329 S.E.2d 53 (1985); *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982); *State v. Pietranton*, 137 W.Va. 477, 72 S.E.2d 617 (1952).

■ "The *animus furandi*, or the intent to take and deprive another of his property, is an essential element in the crimes of robbery and larceny." Syllabus Point 2, *State v. McCoy*, 63 W.Va. 69, 59 S.E. 758 (1907). It is thus fundamental to the definition of larceny that the personal property must be taken without the consent of the owner, otherwise there is no criminal intent. *State v. Green*, 170 N.J.Super. 292, 406 A.2d 310 (1979); 50 Am.Jur.2d *Larceny* § 23 (1970); 52A C.J.S. *Larceny* § 21 (1968); R. Perkins, Criminal Law 245–46 (2d ed. 1969).

■ It is also widely recognized that one who takes property in good faith under fair color or claim of title, honestly believing he is the owner and has a right to take it, is not guilty of larceny, even though he is mistaken in such belief, since in such case the felonious intent is lacking. This Court adhered to the general rule in Syllabus Point 2 of *State v. Bailey*, 63 W.Va. 668, 60 S.E. 785 (1908):

"If a person take property of another under an honest belief of right in himself to do so, he is not guilty of larceny thereof, even though he took it with knowledge of the adverse claim of such other person, and his own claim ultimately prove to be untenable."

*See also State v. Winston*, 170 W.Va. 555, 295 S.E.2d 46, 49 (1982).

This general rule has been held to apply to one who sells the property of another with the consent of an agent or a servant of the owner and to one who takes personal property with the honest belief that he has a right to do so under a contract. *See* 50 Am.Jur.2d *Larceny* § 41 (1970); R. Perkins, *supra*, at 265–66 (2d ed. 1969).

The following statement from 52A C.J.S. *Larceny* § 25 at 448 (1968), is directly applicable to Kelly's defense in the instant case: "One who takes the property of another by the authority of a third person whom he believes in good faith to be the owner or entitled to the possession is not guilty of larceny." (Footnote omitted). This matter is summarized in W. LaFave & A. Scott, Handbook on Criminal Law 638 (1972), as follows:

"One may take the property of another honestly but mistakenly believing ... that the owner has given him permission to take it as he did. In ... such event, he lacks the intent to steal required for larceny, even though his mistaken but honest belief was unreasonable. As to how the defendant can prove his claim that he actually had such an honest belief, it has been pointed out that the openness of the taking, as well as the reasonableness of the belief, though not conclusive, will buttress his claim of good faith." (Footnotes omitted).

■ A number of courts have considered cases in which the defendant took property with the consent and at the request of the owner's wife. The general rule is that the defendant is not guilty of larceny, if he believed at the time of the taking that he had a right to do so, at least where the defendant had not sustained an adulterous relationship with the owner's wife. Annot., 14 A.L.R. 1271 (1921); 50 Am.Jur.2d *Larceny* §§ 24, 25 (1970); 52A C.J.S. *Larceny* § 22 (1968).

This Court considered a factual situation of this type in *State v. Flanagan*, 48 W.Va. 115, 35 S.E. 862 (1900), and reversed a larceny conviction on the ground that the evidence did not establish an intent to steal.

There the defendant at the request of the owner's wife entered a milk house, took possession of a variety of food stuffs, and shipped it to her without the knowledge of her husband. The facts in the case indicate that although the defendant took the goods at night, he was advised as to how to obtain them by a daughter and after he had taken the goods, he made no effort to conceal them.

The intent to steal, being a state of mind, ordinarily must be proven circumstantially by inferences drawn from the defendant's conduct and the circumstances surrounding such conduct. Where circumstantial evidence is relied on, we have held in Syllabus Point 2 of *State v. Dobbs*, 163 W.Va. 630, 259 S.E.2d 829 (1979):

> "Circumstantial evidence will not support a guilty verdict, unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create only a suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction."

*See also State v. Watts*, 172 W.Va. 602, 309 S.E.2d 101 (1983); Syllabus Point 1, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980); Syllabus Point 2, *State v. Hunter*, 103 W.Va. 377, 137 S.E. 534 (1927); Syllabus Point 4, *State v. McHenry*, 93 W.Va. 396, 117 S.E. 143 (1923).

In this case, we believe the evidence when viewed in the light most favorable to the prosecution, as it must be under Syllabus Point 1 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), does not establish beyond a reasonable doubt that the defendant acted with criminal intent because he believed that he had proper authority to remove the mantels. As we have outlined at some length, both Kelly and his codefendant testified that the oak mantels were sold on behalf of Bradley, who Kelly believed was an owner of the property. Bradley, however, for reasons not shown in the record, did not testify at trial despite the critical importance of his testimony. Bradley was the spouse of one of the owners at the time the mantels were removed from the houses. The sale was made to a local merchant, Maher, through another merchant, Casto, both of whom visited the premises. The taking was done openly and in broad daylight. It is of particular significance in our view that when Casto agreed to buy the mantels at his furniture store, Kelly indicated that he had to make a phone call to make certain that he could accept the money for the sale. This additional evidence came from two of the State's witnesses, Casto and Taylor. Furthermore, Taylor worked for Casto who ran a new and used furniture store and it was Taylor who assisted in removing the mantels. This testimony from the State's witnesses added substantial support to the defendant's claim that he acted in good faith.

Considering all the circumstances, we conclude the State did not present " 'substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' " *State v. DeMastus*, 165 W.Va. 572, 583, 270 S.E.2d 649, 657 (1980), *citing State v. West*, 153 W.Va. 325, 333–34, 168 S.E.2d 716, 621 (1969). Consequently, we cannot assent to his conviction.

For the foregoing reasons, the judgment of the Circuit Court of Wood County is vacated and the case is remanded for the entry of a judgment of acquittal as required by Rule 29 of the Rules of Criminal Procedure. *State v. Watts*, 172 W.Va. 602, 309 S.E.2d 101 (1983).

Reversed and Remanded, with Directions.