# CHARLESTON.

## STATE *v.* GRANVILLE HARRISON.
### (No. 5184.)

Submitted February 10, 1925.  Decided February 17, 1925.

1. CRIMINAL LAW—*To Convict by Circumstantial Evidence, Corpus Delicti Must Be Proven by Direct Evidence or by Cogent and Irresistible Grounds of Presumption.*

   To convict of crime by circumstantial evidence, it is an inflexible rule that the *corpus delicti* be first proven by direct evidence, or by cogent and irresistible grounds of presumption. (p. 234).

   (Criminal Law, 16 C. J. § 1579.)

2. RAPE—*Requirements of Circumstantial Evidence to Establish Statutory Rape or Attempt to Commit it, Stated.*

   Where circumstantial evidence is relied upon to establish the statutory crime of rape, or of an attempt to commit that crime, it is essential that all the circumstances from which the conclusion of guilt is drawn and without which it cannot be drawn, shall be established by full proof; and that each essential circumstance must be proved in the same manner and to the same extent as if the whole issue rested upon that particular essential circumstance.   (p. 234.)

   (Rape, 33 Cyc. pp. 1491, 1495.)

3. CRIMINAL LAW—*Requirements of Circumstantial Evidence to Convict Stated.*

   In order to convict, such essential circumstances when fully proven, must not only be consistent with the hypothesis of the guilt of the accused, but must be inconsistent with any reasonable hypothesis of his innocence.  If the facts and circumstances be consistent with a reasonable hypothesis of innocence of the accused, a verdict of guilty, based thereon, should be set aside.   (p. 234).

   (Criminal Law, 16 C. J. § 1568.)

4. SAME—*Permitting Witness to Detail Conversation with Prosecutrix Next Day After Alleged Offense Concerning Her Then Condition and Inferences and Conclusions Drawn Therefrom Held Error.*

   It is error in the trial of an indictment for rape to permit a witness to detail a conversation with the prosecutrix, had with her the next day after the alleged commission of the crime, concerning her then condition and the inferences and conclusions drawn therefrom.   (p. 235).

   (Criminal Law, 16 C. J. § 1275.)

   (NOTE:   Parenthetical references by Editors. C. J.—Cyc.  Not part of syllabi.)

Error to Circuit Court, Jackson County.

Granville Harrison was convicted of assault with intent to commit rape, and he brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*Lewis H. Miller* and *J. Luther Wolfe,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

The indictment charges defendant with the crime of rape upon Orva Coleman, a female under 16 years of age. The jury returned a verdict of "assault with the intent to commit rape," upon which the court sentenced defendant to confinement in the penitentiary for five years, that being the maximum punishment for attempt to commit a capital crime. Error is prosecuted to this court.

The errors assigned are in the admission of evidence; giving of instructions for the State; in refusal of peremptory instruction for defendant; prejudicial remarks made to the jury by the court; and refusal to set aside the verdict, because contrary to the law and evidence.

It will be necessary to detail the evidence, which is circumstantial in its nature, at some length.

The prosecutrix and her older sister were on a visit to some relatives near Watts Chapel on the left fork of Pocatalico River in Jackson County. Defendant and his family, consisting of a wife and three children, were temporarily at the house of the wife's father in the vicinity of Watts Chapel. A series of religious meetings were being held at the chapel. The prosecutrix, accompanied by her escort, Alf Huffman, her sister, "Freddie" Coleman, Hobson Harrison, Audra Harrison, Verba Kessel, Ralph Harrison and perhaps some other young people, left the home of Sherman Harrison to attend the night services at the chapel a mile or so distant, on Monday evening in the latter part of January, 1923. She was on horseback, riding behind Huffman on his horse. On the journey Huffman rode behind a schoolhouse by the road and gave her a drink of whiskey out of a bottle. They then

rode with the others until they reached Faber's barn near the road, where she says she first saw defendant standing at the gate by the road, his horse being hitched near by. They all stopped there a few minutes in conversation, and defendant and Huffman exchanged horses, it appearing that the Huffman horse, being somewhat spirited, had thrown the prosecutrix and her escort, or they had fallen off, at some point before they reached the barn. She says defendant there offered her some whiskey which he had in a jar and she took "not very much," he remarking that if she took the liquor offered "*they* would not bother her." Defendant and others present contradict her statement that defendant gave her liquor on that occasion. Defendant preceded the others to the church and was in the road with another witness "trying out" the Huffman horse when they arrived. It is in evidence that the prosecutrix fell off the horse when they stopped at the church to alight. She says she lost consciousness just before she reached the church and never regained her senses until about four or five o'clock the next morning when she was at the home of Sanford Clendennin a mile or so from the church. She knew nothing of what transpired from that time until she awoke at Clendennin's home. It appears that her sister "Freddie" and the latter's escort entered the church as the prosecutrix and her escort Huffman stepped upon the lower step at the entrance. Neither the prosecutrix nor Huffman entered the church. After a few minutes the sister being concerned at the absence of the prosecutrix, evidently aware of her intoxication, sent Voyd Casto out to see about her. He did not speedily return and she and Verba Kessel left the church on the same mission. They saw defendant in the yard and proceeded with him and a party of four or five other young people up the hollow above the church to look for the missing girl. The sister says that defendant refused to let her proceed and said he, defendant, said "he knew where they was and was guarding them to see that nobody went to them." The others testify that they did proceed up the hollow for about one hundred yards, one of the party "hallooing" for Huffman, and that defendant made no remonstrance or effort to stop them, and

they heard no such conversation between defendant and the sister. She sent a messenger after some relatives living near by to assist in the search, but they arrived after the girl had been found. She says defendant remarked to her when she said she would send for Sant and Uncle Boyd, that "they couldn't get her." Voyd Casto, a witness for the State, says he came out of the church at the request of the sister to look for the prosecutrix and saw her in the yard and talked to her. She appeared drunk but said she was glad to see him, that he was her cousin, and she had wanted to see him for a long time. He saw defendant Harrison there and several other young people. He thinks Harrison started off in the direction of the hollow with the prosecutrix but could not say if he went more than a few steps. At that time a "whole bunch" started off with them. In the party that went was Bo. Harrison, Alf Huffman, Waldo Garnes, Albert Harrison's boy (who was summoned as a witness), and perhaps his little brother. A few minutes later while witness was talking to Shadie Harrison by the church, defendant came to them and asked for a match to light a cigarette. It was after this time that the sister and Vera Kessel came out and the party of young people accompanied by defendant went up the hollow looking for the prosecutrix. Boyd Coleman and S. L. Clendennin both went to the church upon solicitation by the sister, or of a messenger from her, to look for the prosecutrix, and when they got there Odbert Harrison, on horseback, upon coming down the hollow or small stream above the church, had found her near the road about one hundred yards from the church where she attracted his attention by a sound as if she was trying to vomit, and had with difficulty taken her up in front of him on his horse and brought her down to the church, from which place he took her in the manner indicated to Clendennin's home a mile or more down the stream. Defendant was at the church, and joining the party going down the road some controversy arose over the affair between defendant and Boyd Coleman, an uncle of the prosecutrix, the controversy degenerating into a fight. John Casto was in the church and observing the young people go out followed them to learn what was transpiring. Near the

entrance he met the sister and another girl or two and was
told by the sister that "there is some of them got my sister
drunk up the hollow below here and won't let none of us
go to her" (what the sister said to the witness was objected
to, but the court let it go to the jury). Thinking his boy,
Voyd, who had left the church as before detailed, was a par-
ticipant, he proceeded up the hollow hallooing for him. A
short distance up the hollow he was met by defendant in
company with a young man whose name witness did not
know and he inquired for his boy and was told by defendant
that he was at the church and he, defendant, would go there
with him to find the boy. Witness said he saw the bulk of
something lying across the branch but he could not tell what
it was. He told defendant that the sister had accused him
of having made the girl drunk and would permit no one to
go to her, which charge defendant then denied. Defendant
said he met this witness a short distance from the church
at the stream as detailed and that he had gone there at the
direction of the boy to get a drink of water and was on that
errand when the witness came up. One more witness is im-
portant in connection with the presence of the prosecutrix
and defendant up the hollow near the stream. This witness
was O. L. Boggess, who after having heard that the prose-
cutrix was missing and a search was being made for her, left
the church after services were over for his home accompanied
by the preacher and his (witness's) 13-year-old daughter.
While traveling the road leading up the hollow they heard a
"powerful" noise across the stream which the preacher in-
terpreted as being made by a horse. He told the preacher
and daughter to walk on. He then went in the direction of
the noise with his lantern which was lit, and saw some one
whom he judged to be Alf Huffman run up over the hill. He
said he saw defendant in a reclining position against the
bank, and the prosecutrix lying some ten or fifteen feet from
him on the ground. Witness was within ten to twenty feet
away from them and said that defendant was looking at the
witness. Witness spoke no word to either, nor was he spoken
to by them. Witness then turned away and overtook the
preacher and daughter, and went on home. He did not ad-

vise those searching for the girl, some of whom were near. His excuse was that he had been informed that defendant forbade people to come to him. His story was rather unusual, to say the least, but the jury had the right to believe or disbelieve it. Leaving the testimony as to what transpired at the church and near vicinity, it appears that the prosecutrix, when she reached Clendennin's house, still apparently unconscious, made some remarks detailed by Clendennin and his wife in their presence and perhaps the presence of others. They say she appeared not to be conscious. She is reported to have said to Clendennin, ''Oh, Sant, if you knowed what they done to me you would go after them and kill them.'' She was sitting in a chair, and Clendennin told her to hush, and to go on to bed. The prosecutrix had on a pair of dark bloomers which she took off the next morning and laid them on a chair and when she returned from the kitchen they were gone. It will be remembered that the prosecutrix had stated that she did not regain consciousness until about 4 or 5 o'clock the next morning. She identified the bloomers, which were put in evidence, by the way they were made, mud stains on them from the horse throwing her in the mud, and by a whitish stain she said she observed on them and which were not on them before she went to church. The garment was torn in front, to what extent does not appear. She testified that next morning she felt sore in her private parts. Mrs. Clendennin was permitted to detail to the jury the impressions made on her by a conversation she had with the prosecutrix on the following morning. This, in substance, is the case made out by the State. It is unimportant to summarize the evidence for the defense except to say that the defendant denied that he gave the prosecutrix whiskey, or that he took her from the church up the hollow, or that he prevented any one from searching for her; or that he was near her as detailed by Boggess. He is corroborated in many details by his witnesses. It appears that Huffman had disappeared and his whereabouts was unknown. ''Freddie'' Coleman, the sister, said that defendant offered her whiskey on three several occasions as they went to church, but that her escort nudged her on each occasion not to take it, and in-

formed her that it was "doped." This is one of the assign-
ments of error of the many on the admission of evidence.

It appears that the jury after the submission of the case,
had returned into court with the information that they could
not agree; but the court would not discharge them, and after
making remarks to them, directed them to return to their
room and attempt to agree on a verdict; and the remarks of
the court are assigned as prejudicial.

It will at once be observed that the evidence of the com-
mission of the alleged crime is entirely circumstantial. No
one saw defendant nor any other person attempt to commit
rape on the prosecutrix or make an "assault upon her with
intent to commit rape." In all cases of circumstantial evi-
dence it must be established by full proof that a crime has
been committed; for if there has been no crime, there can be
no criminal; and after that fact has been established with the
fullness required (and circumstantial evidence is always
scanned with great caution), it is also necessary that the cir-
cumstantial evidence should to a moral certainty exclude
every other hypothesis except that of the guilt of the ac-
cused, before a conviction will be permitted to stand; and
every single circumstance in the chain essential to the con-
clusion of guilt must be proven in the same manner and to
the same extent as if the whole issue had rested upon that
essential circumstance. *State* v. *Flanagan,* 26 W. Va. 116;
*State* v. *Bennett,* 93 W. Va. 548, 117 S. E. 371, where Judge
LITZ states the rules of law in such cases at length and with
clarity.

Was there a crime committed? We have nothing to base
this conclusion upon except that the prosecutrix says she was
sore in her private parts on the next morning. No examina-
tion was made by anyone, either expert or non-expert. Her
bloomers were muddy and torn. That often occurs to the
garments of persons who have been intoxicated. She fell off
of her horse twice the evening before. She was carried by
the witness who found her, before him on his horse in a limp
condition supported by him, and her soreness may have re-
sulted from contact with the saddle. A strenuous physical
effort was required by him to get her on the horse. What

she told Mrs. Clendennin next morning and the impressions made on Mrs. Clendennin were clearly inadmissible and prejudicial and will be hereinafter discussed. The unconscious remarks made by the prosecutrix the night when she sat in the chair, even if admissible, were not convincing of an assault made upon her by the defendant. The evidence to establish the *corpus delicti* has not been shown with the degree of fullness required by long experience in criminal jurisprudence. But passing that requirement, and presuming that a crime was committed, we are confronted with a failure of the evidence to exclude every other reasonable hypothesis of innocence of the accused, although it might be consistent with his guilt. There was ample opportunity for others to have committed the attempt, if any such attempt was made. Huffman was with her when she arrived at the church and in the party of young men who left the church with her when she went up the hollow a short distance away. He did not return until after the church services were over. A "bunch" of young men including Bo. Harrison, Huffman, "Albert Harrison's boy that is summoned here" and probably his little brother, went with her, according to the evidence of State's witness Voyd Casto. Can it be said to the exclusion of every reasonable hypothesis that the circumstances point irresistibly to an assault by defendant? There is no doubt he acted culpably when he gave her liquor, if he did so; or that he may have acted culpably when he prevented her sister and two friends from finding her in her drunken condition when they were on their quest, if he did so. Was he trying to shield her from public disgrace because of her drunken condition, or was there a sinister design for the accomplishment of a heinous crime? The circumstances arouse strong suspicion against him, but suspicion, however strong, does not convict.

Mrs. Clendennin was permitted to testify that the next morning after the prosecutrix was brought to her house she had a conversation with her concerning her condition and the impressions which were made on her mind by the answers given to her questions. She made no examination of the girl, but the inference to be drawn from her evidence was that

the impression received by her from the conversation was that the prosecutrix had experienced sexual intercourse. This evidence we regard as highly prejudicial. It is reversible error to permit a witness to detail any of the particulars of the commission of the alleged crime of rape told to her by the prosecutrix hours after the offense occurred. It is not a part of the *res gestae.* It is permissible for the witness to state that the prosecutrix made complaint, but to that extent only should the evidence go. 22 R. C. L. page 1213, Sec. 48; *State* v. *Griffin,* 43 Wash. 591; 11 A. & E. Anno. Cases 95; *People* v. *Mayes,* 66 Cal. 597; *Shartzer* v. *State,* 63 Md. 149; *Castillo* v. *State,* 31 Tex. Crim. Rep. 145; *Brogy* v. *Comm.,* 10 Gratt. (Va.) 722. ''By weight of authority evidence must be confined to the particular fact that complaint was made; the details or particulars of the complaint not being admissible as substantive evidence unless the statement is a part of the *res gestae,*'' 33 Cyc., p. 1463. Repetition of what the prosecutrix said of how she felt and the impressions made on her by her feelings violates the rule against hearsay evidence. In passing it may be noted that John Casto was permitted, over objection, to detail a conversation had with ''Freddie'' Coleman in the absence of defendant, when Casto came out of the church to see what was going on, to the effect that she told him ''there is some of them got my sister drunk up the hollow there and won't let none of us go to her.'' While not so glaringly prejudicial as the evidence of Mrs. Clendennin it was hearsay and should not have been permitted. It was probably harmless. The evidence that ''Freddie's'' escort nudged her and told her not to take the liquor offered her by defendant and that it was ''doped,'' was prejudicial unless defendant was present and heard the remark. It does not clearly appear that defendant saw the action or heard the caution given her by her escort.

We have carefully gone over the assignment of error relating to the remarks of the court to the jury when they reported they could not agree. He directed their attention to the trouble of retrying such cases, and said they ought to decide the case if possible and requested them to try for half an hour or more to see if they could agree. Nothing can be

gleaned from the remarks which would indicate the opinion of the court as to what verdict should be given, whether for or against the accused. It was nothing more than an earnest request for the jury to try to agree after further consultation and deliberation. The instructions on the crime of rape were improper because the necessary element of that crime (penetration to some degree) was entirely absent from the evidence. Much reliance is placed upon the assignment or error that the verdict was not in proper form. It is argued that a verdict of "assault with intent to commit rape" has no basis under the indictment. As the verdict must be set aside, it would be rather academic to discuss this assignment. The question is discussed in *Liebscher* v. *State,* 69 Neb. 395, 5 Am. & Eng. Anno. Cases 351.

It was error to refuse to set aside the verdict as being contrary to the law and evidence.

The judgment is reversed, verdict set aside and new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*