STATE OF WEST VIRGINIA *v.* CLARENCE STEPHENSON

(No. 7621)

Submitted November 10, 1933.   Decided December 16, 1933.

*C. C. Chambers* and *T. G. Nutter,* for plaintiff in error.
*Homer A. Holt,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for the State.

LITZ, JUDGE:

The defendant, Clarence Stephenson, charged with the slaying of Mamie Thurman, was convicted of murder in the first degree, and, upon the further finding of the jury, sentenced to life imprisonment.

The evidence is circumstantial. The body of the deceased was found June 22, 1932 (about 2 P. M.), near the public road on top of Trace Mountain, in Logan County, with two bullet wounds through the head (apparently produced by a .38 caliber weapon), the throat cut and neck broken. One bullet entered behind the left ear, and, ranging upward, emerged an inch and a half above the right ear. The other, entering on the left side of the forehead, made its exit at the back of the head. There were powder burns over the face and in the wound at rear of the left ear. According to medical testimony, death resulted instantly from the gunshot wounds before the throat was cut. The hat of deceased was lying fifty feet from the body. A hole in it indicated that it had been penetrated by one of the bullets. One shoe and her pocketbook, containing eight or ten dollars and other articles, were six or eight feet away. Two diamond rings and a wrist watch, belonging to deceased, were also found on the body. She was thirty-one years of age and the wife of Jack Thurman. He was forty-eight and a member of the city police of Logan. They had been married twelve years, and, for the past eight years, had occupied an apartment over the private garage of Harry Robinson, in the city of Logan. Robinson was married, living with his wife and two children (a daughter fourteen and a son eight) in a dwelling a few feet from the garage. He was employed in a Logan bank where deceased sometimes worked. They had been intimate for two years. Defendant was an unmarried colored man, thirty-eight years of age. He had been staying at the Robinson home for five months immediately preceding the tragedy. He had also lived there for a period of six weeks a year or two previously and had been around the home for shorter periods at other times. He slept in the attic, made his toilet in the basement of the home, and used a lavatory in the basement of the courthouse, doing odd chores around the home and attending a pack of hounds belonging to himself and Robin-

son for his board and lodging. He and Robinson had been acquainted since 1923, and frequently engaged in fox chasing together at nights in the country surrounding Logan. Stephenson had at his disposal a Ford sedan automobile owned and maintained by Robinson, which they used in transporting their dogs with them to and from the hunting grounds. It had been equipped for the purpose by removing the cushion from the rear seat and placing a piece of tarpaulin six by eight feet in dimensions over the back of the front seat and the rear part of the car. Curtains, made of canvas, were also hung from the doors. Upon at least three of their hunting excursions in recent months, Stephenson, at the instance of Robinson, had conveyed Mrs. Thurman in the Ford car from Logan to points in the country where she met Robinson for immoral purposes. On the last of these trips, Saturday night before her murder, she was taken by Stephenson from the home of Fannet Jones, a colored woman living in Logan, where she had gone to meet Robinson. Between 6 and 7 P. M., of the day before the body was found, defendant was seen talking with Mrs. Thurman near the garage. A short while later, she left her home, accompanied by Mattie Bell, a colored woman who had just delivered some laundry to her. The two went directly to a Piggly Wiggly store where Mrs. Thurman obtained $1.50 to pay the colored woman for services. A few minutes later, Mrs. Thurman entered a drug store where she purchased some articles and remained about twenty minutes. She was later seen, about dark, walking in the direction of the home of Fannet Jones; and, thereafter, was observed entering and leaving the Fannet Jones home. She last appeared, about 9 o'clock, walking alone near a theater in Logan.

Defendant was seen on the streets of Logan driving the Ford between 8:30 and 9 o'clock. He was again observed about 11 P. M. sitting on the steps of the Guyan Valley Bank. According to the testimony of one witness for the state, he was driving the Ford on the streets of Logan about 12:30 A. M. A car answering the description of the Ford passed Roy Hall, Frank Gibson, and two other men about 5:40 A. M. while they were returning together from work, walking along the road leading from Trace Mountain to Logan. They testified that the car was traveling at a fast rate of speed in the

direction of Logan, driven, apparently, by a colored man, and that Hall remarked to Gibson as it passed near him, "Look out there Frank, that negro liked to have hit you." A few minutes later, the defendant, driving the Ford in the same direction, was recognized by a witness well acquainted with him; and about 6 o'clock another witness observed him driving into Logan from the direction of Trace Mountain. Other witnesses saw him later in the morning, after driving the car from the garage, inspect and clean it. On the same day, he removed the tarpaulin and canvas curtains. A few hours after the body was found, he and Robinson were arrested on the charge of being implicated in the murder, and the car was taken into custody by members of the department of public safety. Several witnesses who examined it testified that they found blood on the back of the front seat to the right which had soaked through the tarpaulin and upholstering into the batting. They also found, under the rubber floor mat in front, a deposit of blood four or five inches long extending from near the edge of the mat to a point underneath where it formed a clot. Upon a search of the Robinson premises, the tarpaulin was discovered in the coal bin in the basement and a piece of canvas used for side curtains was found in the garage between a box and the wall. Both were blood-stained. A shirt belonging to defendant with blood on the right sleeve was also found in the attic. A chemical analysis of the blood on all the articles proved it to be human blood. Hairs on the dress worn by deceased at the time of her death corresponded with dog hairs on the tarpaulin.

The defendant relies on an alibi and insufficiency of the circumstances tending to establish his guilt. He testified that he went to bed in the attic between 11 and 11:30, and did not arise until 6 or 6:30 the next morning, when he went down to the first floor to take some medicine, returning to bed where he remained until he was called by Mrs. Robinson between 8 and 9 o'clock. Mr. and Mrs. Robinson and Oscar Townsend, who roomed at the home, testified that they heard some one go to the attic a short while after 11 o'clock, whom they assumed to be the defendant, and never heard any one come down from the attic during the night. Their evidence does not indicate that they even heard the defendant when,

as he claims, he came down from his room at 6 or 6:30 in the morning. The defendant undertakes to explain the blood found on the back of the front seat of the car and his shirt sleeve, but is unable to account for other evidences of blood. He says that he wiped his nose while bleeding with his shirt sleeve and that on another occasion his nose bled while he was asleep in the car. He admits that he and Robinson were together at the Robinson home and saw Mrs. Thurman leave her home with the colored woman; that Robinson then requested him to go to the home of Fannet Jones to ascertain who was there; and that he drove to the Jones home about 9 o'clock that night in compliance with this request. He admits also that he sat on the steps of the Guyan Valley Bank for fifteen or twenty minutes about 11 o'clock in the night, at the instance of Robinson, watching for Mrs. Thurman to come from a nearby apartment building.

The assignments of error are: (1) That the jury commissioners in preparing the lists of persons to serve on the grand and petit juries in Logan County for the year 1932, failed to include thereon any colored persons and excluded therefrom negroes solely because of their race and color; (2) that the trial court admitted improper evidence offered by the state; (3) that the trial court refused to admit proper evidence offered by the defendant; (4) that the trial court, over the objection of the defendant, granted improper instructions on behalf of the state; (5) that the trial court refused proper instructions on behalf of the defendant; (6) that the court permitted improper argument by counsel for the state; (7) that the evidence is insufficient to sustain the verdict; (8) that the crime was not proved to have been committed in Logan County.

Neither plea nor evidence was presented raising or sustaining the first point of error.

The chief complaint under assignment No. 2 is the admission of the remark by Roy Hall to Frank Gibson (when a car answering the description of the Ford passed them and their two companions on the road), "Look out there Frank, that negro liked to have hit you." The witness explained this remark by saying that the person driving the car looked dark and that he did not think his color was due to coal dust

because there were no mines in operation in the direction from which the car was coming. This was a spontaneous statement, the admission of which we do not think was prejudicial to the defendant, especially in view of the testimony of other witnesses who saw a car of similar description a short while later, driven by the defendant.

The state was permitted to ask the defendant whether he had been intimate with the deceased. He admits that evidence of such relation between himself and deceased was proper. His contention that he should not have been asked about it on cross-examination is without merit.

No evidence offered by the defendant is pointed out as having been improperly refused.

The granting of the usual instruction on murder in the first degree, at the instance of the state, was certainly justified under the evidence.

Complaint is made of the refusal of instructions 9, 10 and 11 on circumstantial evidence offered by defendant. These instructions are fully covered by other instructions granted on his behalf. The law does not require a repetition of instructions.

The main reliance for reversal is the refusal of an instruction requested by defendant, defining the degrees of homicide and permitting the jury to find him not guilty or guilty of any grade of the offense. The state answers that the only issue, under the evidence, was whether the defendant had committed the crime, and that he was, therefore, guilty of murder in the first degree or not guilty. There is certainly no reasonable basis in the evidence for the theory that the perpetrator of a crime so heinous and savage could be guilty of a lesser offense than murder in the first degree. "Under the prevailing rule, one convicted of murder in the first degree is not entitled to a new trial for a failure to charge with respect to a lower degree of murder, where there is no evidence tending to show the commission of a lesser offense than murder in the first degree." 21 A. L. R. 603. A later annotation in 27 A. L. R. 1097 sustains the same rule. In *Monmouth* v. *State*, 54 Tex. Cr. R. 407, 114 S. W. 114, it is stated: "Though the evidence is circumstantial if it does not admit of any conclusion other than deliberate assassination,

no instruction on murder in the second degree is required." In *Rhodes* v. *State,* 17 Tex. App. 579, where the defendant was charged with the murder of his wife by first shooting her in the head, and then cutting her throat with a knife, the court said: "There was no evidence in the case presenting the issue of murder in the second degree, and the court very properly declined to submit to the jury any other issue than that of murder in the first degree." In *Higgins* v. *Commonwealth,* 142 Ky. 647, 134 S. W. 1135, 1136, it is held that the rule requiring a charge to the jury on the different degrees of homicide "does not apply where there is no evidence to show voluntary or involuntary manslaughter or self-defense, or where from all the proof defendant is either guilty of murder or innocent." In *Thornton* v. *Commonwealth,* 24 Grat. (Va.) 657, where the defendant was charged with murder by poison, the court said: "The prisoner was either guilty of that offense or guilty of no offense at all. * * * And it could not, therefore, have been erroneous to charge the jury to that effect. To have charged them as to what constituted murder in the second degree, or voluntary or involuntary manslaughter, or as to the measure of the punishment of each, could have answered no good purpose, and could have had no other effect, if any, than to confuse the jury or mislead them into error."

We see no basis for legal complaint to argument of counsel for the prosecution presenting to the jury the theory that the defendant had enticed deceased away from Logan under the pretext that Robinson wanted to meet her, and had then killed her when she resisted his own advances. Such inference reasonably might have been drawn from the evidence.

We would not be warranted in reversing the judgment for insufficiency of evidence, under the circumstances, presented by the proof, so convincing of guilt.

We reject the theory that the venue of the crime was not proved. Mrs. Thurman was last seen alive in Logan County and her body was later found there. There is no evidence that she had been taken out of the county before the murder. The venue, as well as the crime, may be established by circumstantial evidence. *State* v. *Alderson,* 74 W. Va. 732, 82 S. E. 1021.

The judgment of the circuit court is, therefore, affirmed.

*Affirmed.*