STATE OF WEST VIRGINIA

*v.*

THOMAS R. BURTON

(No. 13948)

Decided April 10, 1979.

*Jones, Williams, West & Jones, John S. Kaull* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Leonard B. Knee,* Assistant Attorney General, for defendant in error.

MILLER, JUSTICE:

The defendant, Thomas R. Burton, appeals his rape conviction in the Circuit Court of Taylor County under our prior statute, W. Va. Code, 61-2-15.[1] He urges five

---

[1] "If any male person carnally knows a female person, not his wife, against her will by force, or if any male person over the age of sixteen years carnally knows a female person of previous chaste character, not his wife, under that age, or if any male person over

principal errors: (1) the State failed to prove he was the perpetrator of the crime; (2) the court permitted testimony from an attorney over the defendant's claim of the attorney-client privilege; (3) the court erred in permitting a State's witness to invoke the Fifth Amendment privilege as to a prior criminal conviction; (4) the court prejudiced the defendant's case by making adverse comments before the jury; (5) the State failed to prove the venue of the crime.

For the reasons set out below, we affirm the conviction.

## I

## IDENTITY ISSUE

In order to understand the defendant's claim that there was insufficient evidence to establish his identity, it is necessary to set out the salient facts surrounding the crime as developed in the State's case. In treating claims of evidentiary insufficiency on the part of the State's case, we utilize the rule in the first syllabus of *State v. Starkey*, _____ W. Va. _____, 244 S.E.2d 219 (1978):

> "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

The crime occurred at a bar in Grafton shortly after 1:00 a.m. on January 9, 1976. The defendant was at the bar around midnight and had engaged in conversation with the manager of the bar, Mrs. Duckworth, and the

the age of sixteen years carnally knows a female person, not his wife, under the age of ten years, he shall be guilty of a felony, and, upon conviction, shall be punished with confinement in the penitentiary for life, ..."

victim, a waitress. He advised Mrs. Duckworth that he had to get a check cashed but would be back. Shortly after this, the defendant left the bar.

A State's witness, Carrie Bray, testified that about 1:00 a.m. on January 9, 1976, the defendant came to her apartment to talk with her boyfriend, Charles Jones. She did not hear their conversation, but after about 15 minutes Jones left with Burton. Before leaving, Jones borrowed $3.00 and a pair of her nylon stockings.

Around 1:15 a.m., Mrs. Duckworth was looking out the window of the bar and saw the defendant drive into a parking area and get out of his car. There appeared to be no one with him. When he came into the bar, no one else was present except Mrs. Duckworth and the waitress. The defendant ordered a drink and talked with Mrs. Duckworth.

After he had been at the bar a short time, the defendant started to leave. Upon going to the front door and opening it, he was confronted by a man wearing a stocking over his face and carrying a gun, who ordered him back into the bar. The gunman stated that it was a holdup, told the defendant and the two women to lie down on the floor, and then went behind the bar and extracted the money from the cash register.

The gunman then ordered the women tied and placed in the ladies' restroom. The women stated that from the restroom they could hear furniture being moved and the jukebox being played. At one point, the defendant came into the restroom and told the women the gunman was "acting crazy." The defendant was not tied, and the gunman yelled at him to get out of the restroom.

The waitress testified she heard the two men whispering, and shortly thereafter that the gunman came into the restroom and took her into the main room. She was told to find Mrs. Duckworth's purse and car keys. At this time, she observed that the defendant was lying on the floor but was not tied. She was then blindfolded and after again hearing whispering and with her hands still

tied, someone put a toboggan cap over her head and cut off her blouse and slacks. Within 15 to 20 minutes, she was twice sexually assaulted. After the assaults, she was placed in the men's restroom.

At some point after the victim had been taken from the ladies' restroom, Mrs. Duckworth was brought out by the gunman. Before he blindfolded her, she observed the defendant standing untied in the hallway. Mrs. Duckworth was then placed back in the restroom. In about one-half hour, the gunman again took her out of the restroom, told her to get her car keys, and removed the blindfold. She gave the gunman her car keys. She stated that at this time the defendant was at the end of the bar. As the gunman started to leave, he told the defendant to get some things that were on the bar, including some bottles of whiskey, and the defendant responded, "You don't want this," to which the gunman replied, "Don't we want to get a little drunk?" The gunman and the defendant left the bar shortly afterwards.

The State also produced Roy Myers, who was in jail with the defendant, and who testified that during the course of a conversation with him the defendant admitted having been involved in a robbery of the bar and having had sexual relations with a girl at the bar, who was tied up.

Additionally, an attorney called in the State's case testified, over the defendant's objection, that while visiting a client in the jail he had talked with the defendant in the presence of other prisoners. The defendant made some general inquiries concerning the elements of the crime of rape. The attorney indicated that one of the prisoners asked the defendant whether she was "worth it," and the defendant replied he thought so.

The crime in this case is forcible rape, which we have customarily defined as carnal knowledge of a female by force, or against her will, by a male person not her husband. *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955); *State v. Schilansky*, 105 W. Va. 549, 143 S.E. 307

(1928); *State v. Tippens,* 91 W. Va. 504, 113 S.E. 751 (1922). There is no question that the State established through the testimony of the victim that while tied, she had been forced against her will to be carnally known by a male person.

The defendant places a great deal of reliance on *State v. Harrison,* 98 W. Va. 227, 127 S.E. 55 (1925), where a rape conviction was overturned because of the insufficiency of the evidence. There, no one saw the rape. The victim had passed out and could not testify that she had been sexually assaulted. Witnesses placed the defendant near the victim at one point during the evening. The evidence in the present case is much more comprehensive.

Here, the corpus delicti was established by direct evidence that someone committed forcible rape on the victim. The primary area of dispute was the identity of the person committing the crime. This latter element is generally held not to be a part of the corpus delicti, since this term means proof that the crime occurred and that somebody's criminality was the source of the crime, as distinguished from non-criminal sources, e.g., accident or natural causes. *State v. Holland,* 149 W. Va. 731, 143 S.E.2d 148 (1965); 29 Am. Jur. 2d *Evidence* § 149; 7 J. Wigmore, *Evidence* (3rd ed. 1940) § 2072; W. LaFave & A. Scott, *Criminal Law* (1972), at 16.

There is no doubt that the defendant's identity was an essential element of the State's burden of proof, even though it was not part of the corpus delicti. Proof of the defendant's identity was by both direct and circumstantial evidence. Both the victim and Mrs. Duckworth testified that the defendant was present at the scene both before and after the rape. He was not tied during that time, further indication of access. The State also had the testimony of the witness Myers, that the defendant admitted sexually assaulting a woman at the bar.[2] Of less

---

[2]"A. At first he told me when they robbed that place over at the End of the Bridge, he said he didn't do it. And after a while, after

importance, but of some probative value, was the defendant's response to a fellow prisoner in front of the attorney, that he thought she was "worth it." We believe the State's case on identity fully met the circumstantial evidence test as expressed in *State v. Noe*, ____ W. Va. ____, 230 S.E.2d 826, 829–30 (1976):

> "The general rules regarding circumstantial evidence are well recognized in this jurisdiction. Briefly stated, circumstantial evidence will not support a guilty verdict unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create a mere suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction. *See State v. Allen*, 139 W. Va. 818, 82 S.E.2d 423 (1954); *State v. Clay*, 135 W. Va. 618, 64 S.E.2d 117 (1951); *State v. Cutlip*, 131 W. Va. 141, 46 S.E.2d 454 (1948); *State v. Hudson*, 128 W. Va. 655, 37 S.E.2d 553 (1946); *State v. Kapp*, 109 W. Va. 487, 155 S.E. 537 (1930); *State v. Snider*, 106 W. Va. 309, 145 S.E. 607 (1928); *State v. Ison*, 104 W. Va. 217, 139 S.E. 704 (1927); *State v. Whitehead*, 104 W. Va. 545, 140 S.E. 531 (1927); and *State v. Hunter*, 103 W. Va. 377, 137 S.E. 534 (1927)."

No claim is asserted that the defendant's admissions were involuntary or otherwise inadmissible.[3] The volun-

---

he knew me, he told me him and Jones planned the job down there.

"Q. Did he tell you what kind of plans they made?

"A. No, he said he was up at Jones's girl friend's house with Jones, and he left there and he went down to the End of the Bridge and had a drink, and he went back home, and after that he asked his wife if she had any cigarettes, and she said—she didn't have none, and he went back down to the End of the Bridge, at the same time he picked up Jones.

"Q. Did he tell you whether or not he had ever had sexual relations with anyone at the End of the Bridge?

"A. Some girl that worked there that they had tied up there on the floor."

[3] An admission is often thought to encompass a more limited inculpatory statement than a confession, which usually covers the

tary inculpatory statements made by the defendant to third parties, together with his actual presence at the scene of the crime, were sufficient to establish his identity. We, therefore, conclude that there was adequate evidence to enable the jury to find the defendant guilty of the crime charged.

## II

## ATTORNEY-CLIENT PRIVILEGE

The defendant contends there was a violation of the attorney-client privilege when the State called an attorney who had talked with him in the jail. Particularly, objection is made to the answer the defendant gave to another inmate when he inquired if she (the victim) was "worth it." The attorney stated the defendant replied something to the effect of "I think she was."

Upon the defendant's objection, the court held an *in camera* hearing. From the record of this hearing, it appears that the attorney had not been retained or ap-

---

entire crime. *See, e.g., Holland v. State,* 244 Md. 671, 224 A.2d 684 (1966); *State v. Myers,* 190 Neb. 146, 206 N.W.2d 851 (1973); C. McCormick, *Evidence* (2nd ed. 1972) § 144, at 309–310. As McCormick observes, for constitutional purposes in the application of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602 (1966), both terms fall under its ambit for statements made in custodial interrogation. *Accord, State v. Smith,* ＿＿ W. Va. ＿＿, 212 S.E.2d 759, 762–63 (1975). We recognized in *State v. Sanders,* ＿＿ W. Va. ＿＿, 242 S.E.2d 554, 556–57 (1978), that under certain circumstances inculpatory statements made by the defendant to third parties may require an *in camera* voluntariness hearing. However, *Sanders'* facts are not present here, nor is there any evidence that Myers was acting as an agent of the State in procuring admissions from the defendant. *Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 S.Ct. 1199 (1964); *cf., Milton v. Wainwright,* 407 U.S. 371, 33 L. Ed. 2d 1, 92 S.Ct. 2174 (1972). We have also stated that a spontaneous inculpatory statement made "before an accusation, arrest or any custodial interrogation is made or undertaken by the police may be admitted into evidence without the voluntariness thereof first having been determined in an *in camera* hearing." Syllabus Point 1, *State v. Johnson,* ＿＿ W. Va. ＿＿, 226 S.E.2d 442 (1976); Syllabus Point 4, *Wilhelm v. Whyte,* ＿＿ W. Va. ＿＿, 239 S.E.2d 735 (1977).

pointed to represent the defendant, but had gone to the jail to see another client. The defendant had his own attorney at this time. Apparently, there were several prisoners in the same area of the jail with the defendant. The attorney stopped to talk with them, and during this conversation the incriminating statement was made.

The State maintains the trial court was correct. In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from the attorney in his capacity as a legal adviser; (3) the communication between the attorney and client must be intended to be confidential. It is the State's position that the first and third elements were lacking.

We recognized the first element in *Woodrum v. Price,* 104 W. Va. 382, 140 S.E. 346 (1927). The fact that the attorney receives no compensation for his services is no bar to the privilege, as noted in *Hodge v. Garten,* 116 W. Va. 564, 182 S.E. 582 (1935), and *Donohoe v. Collett,* 87 W. Va. 383, 105 S.E. 265 (1920). These latter cases acknowledge that the attorney must be acting in his professional capacity in giving the communications, which is the second element of the privileged relationship.

The third element that the communication between the attorney and client must be intended to be confidential, has not been expressly treated by this Court. It does appear that in the foregoing cases, as well as other cases where the privilege has been successfully asserted, the client obtained the advice from the attorney in the absence of third parties. *Hodge v. Garten, supra; Woodrum v. Price, supra; Donohoe v. Collett, supra; see, e.g., State v. Fisher,* 126 W. Va. 117, 27 S.E.2d 581 (1943); *Thomas v. Jones,* 105 W. Va. 46, 141 S.E. 434 (1928).

Generally, the principle of confidentiality holds that an attorney-client communication is not privileged where it is made under circumstances which indicate the client did not intend the communication to be confi-

dential. C. McCormick, *Evidence* (2d ed. 1972) § 91; 81 Am. Jur. 2d *Witnesses* § 185, *et seq.;* 97 C.J.S. *Witnesses* § 284; Annot., 96 A.L.R.2d 125 (1964).

In the present case, two of the three necessary elements to maintain the privilege were lacking. First, at the time of the communication the defendant was represented by other counsel. He initially brought this fact to the attention of the attorney by way of the rather conventional inquiry as to how his present attorney was regarded by other lawyers. There was no reasonable expectation of the engendering of an attorney-client relationship from the outset of the conversation.

Second, all the conversations between the defendant and the attorney were in the presence of several other inmates at the jail, who in fact joined by way of comments into the discussion with the attorney. Clearly, there was no expectation of any confidentiality in regard to the defendant's conversation.

Notwithstanding the lack of any attorney-client relationship, the defendant claims that *State ex rel. Moran v. Ziegler,* ____ W. Va. ____, 244 S.E.2d 550 (1978), should bar the attorney's testimony, as it creates an appearance of impropriety. The defendant misconceives the rationale of *Moran,* which dealt with the disqualification of a special prosecuting attorney who, prior to his appointment, had conferred by telephone with the defendant, a murder suspect. The special prosecutor was then appointed to handle the murder case. While the record in *Moran* was not clear as to the exact content of the telephone conversation, the Court's holding was grounded in the quasi-judicial role occupied by a public prosecutor, citing *State v. Boyd,* ____ W. Va. ____, 233 S.E.2d 710, 717 (1977).

*Moran's* immediate precursor was *State v. Britton,* ____ W. Va. ____, 203 S.E.2d 462 (1974), where the prosecutor's role in regard to his contact with a criminal defendant was discussed at some length. *See also Thomas v. Leverette,* ____ W. Va. ____, 239 S.E.2d 500 (1977). These cases base the disqualification of a prosecutor not

on an attorney-client relationship with the accused, but on the broader ground that the prosecutor may have advertently or inadvertently obtained information which would be detrimental to the accused. We, therefore, conclude that the trial court was correct in holding the communication not to be privileged.

## III

### THE FIFTH AMENDMENT QUESTION

The defendant urges reversible error occurred when the court permitted the State's witness Myers to invoke the Fifth Amendment. The initial invocation was as to questions asked on cross-examination as to why he was in jail. The Fifth Amendment was also claimed on questions relating to whether he had been convicted of a felony in Maine, placed on parole, and violated the parole terms which had brought about extradition proceedings in Taylor County.

The record discloses that when Myers was asked why he was in jail, he invoked the Fifth Amendment through his court-appointed counsel. The court, with the consent of all counsel, then informed the jury that the witness was in jail on an extradition proceeding initiated by the State of Maine. Consequently, the jury was given the answer to the questions and there was no error.

The remaining questions as to which the Fifth Amendment was invoked all related to the felony committed in Maine, the parole from the felony and the violation of parole which brought about the extradition proceeding. Defense counsel argues that the witness' prior felony conviction was not incriminating and this Court has historically recognized the trial court's discretion to permit impeachment of a witness' credibility by a prior criminal conviction. *State v. Justice*, 135 W. Va. 852, 65 S.E.2d 743 (1951); *State v. Crummit*, 123 W. Va. 36, 13 S.E.2d 757 (1941); *State v. Price*, 113 W. Va. 326, 167 S.E. 862 (1933). This matter might be resolved by concluding that the trial court did not abuse its discretion. However, from

the record it appears this issue was handled on a Fifth Amendment basis.[4]

It is apparent that the prior felony conviction was inextricably tied to the parole violation and the pending extradition proceeding. Obviously, one of the key issues in the extradition would be Myers' identity as the person who violated parole on the original felony. W. Va. Code, 5-1-9(h); *Cassis v. Fair*, 126 W. Va. 557, 29 S.E.2d 245 (1944).

This Court has adopted, in accordance with general law, a liberal interpretation of the scope of the Fifth Amendment. 81 Am. Jur. 2d *Witnesses* § 31. *See, e.g., State v. Boyd*, _____ W. Va. _____, 233 S.E.2d 710 (1977); *State v. Blosser*, _____ W.Va. _____, 207 S.E.2d 186 (1974); *State v. Wills*, 91 W. Va. 659, 114 S.E. 261 (1922).[5] It is

---

[4]"Q. Mr. Myers, are you the same Roy Myers who was convicted of a felony in the State of Maine in 1965 and sentenced to serve time in the Maine State Penitentiary and subsequently paroled from the penitentiary?

"Mr. Sweeney: Your Honor, at this point I would like to have, at least to advise my client he has a right to invoke his Fifth Amendment privilege.

"[The Court]: Of course, he has a right to refuse to answer, but it is up to Mr. Myers whether or not he wants to answer.

"Witness: The Fifth Amendment, your Honor.

"Mr. Kaull: Note my exception to the allowing of this individual to selectively take the Fifth Amendment in answer to defense counsel's questions in regard to his credibility and impeachment for credibility.

"Q. Mr. Myers, I suspect you won't answer this one either. But are you also the same Roy Myers who subsequent to the conviction I just mentioned was arrested and convicted in the State of Maine and had his parole revoked?

"A. Fifth Amendment, your Honor.

"Q. And Mr. Myers, is it not true that the reason you were being served with extradition papers and incarcerated in the Taylor County Jail the revocation of the parole that I mentioned in my last question?

"A. Fifth Amendment."

[5]In *State v. Boyd*, _____ W. Va. _____, 233 S.E.2d 710, 714 (1977), we clearly indicated that Article III, Section 5 of the West Virginia

rather uniformly recognized that the privilege against self-incrimination extends not only to those questions which, if answered, would in themselves support a conviction, but also to those disclosures that might furnish a link in the chain of evidence or lead to evidence which could be used in the criminal prosecution. *Kastigar v. United States,* 406 U.S. 441, 32 L. Ed. 2d 212, 92 S.Ct. 1653 (1972); *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S.Ct. 1428 (1967); *Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653, 84 S.Ct. 1489 (1964); *Hoffman v. United States,* 341 U.S. 479, 95 L. Ed. 1118, 71 S.Ct. 814 (1951).

Here, the questions were directed at an area which, if answered, would require disclosures that could well have incriminated the witness Myers at his extradition hearing or subsequent parole revocation proceeding in Maine. Historically, the Fifth Amendment has been extended to answers that would expose one not only to criminal prosecution, but also to forfeitures and penalties. *United States v. United States Coin & Currency,* 401 U.S. 715, 28 L. Ed. 2d 434, 91 S.Ct. 1041 (1971). We do not doubt that an extradition proceeding carries with it a sufficient penalty to cause evidence bearing on the issues arising at such hearing to come within the purview of the Fifth Amendment privilege against self-incrimination.

Moreover, such evidence might also tend to incriminate Myers in his parole revocation hearing in Maine. The privilege against self-incrimination traditionally can be invoked where the claim is made that answering the question will subject the individual to criminal prosecution in another state. *United State v. Freed,* 401 U.S. 601, 28 L. Ed. 2d 356, 91 S.Ct. 1112 (1971); *Marchetti v. United States,* 390 U.S. 39, 19 L. Ed. 2d 889, 88 S.Ct. 697 (1968); *Malloy v. Hogan, supra;* 81 Am. Jur. 2d *Witnesses* § 43.

---

Constitution provides at least a co-equal coverage in regard to the privilege against self-incrimination. Thus, while the parties here assert only the Fifth Amendment to the United States Constitution, the same principles apply under Article III, Section 5 of our Constitution.

■

We have no difficulty concluding that a parole revocation hearing is sufficiently penal in nature to extend the privilege of invoking the Fifth Amendment to the giving of evidence that might be germane to it. *Cf. Morrissey v. Brewer,* 408 U.S. 471, 33 L. Ed. 2d 484, 92 S.Ct. 2593 (1972); *In re Gault, supra; Conner v. Griffith,* _____ W. Va. _____, 238 S.E.2d 529 (1977); *Dobbs v. Wallace,* _____ W. Va. _____, 201 S.E.2d 914 (1974).

The trial court was thus correct in permitting the witness to invoke the Fifth Amendment privilege against self-incrimination.

## IV

## TRIAL COURT'S CONDUCT

The claim is made that the trial court's conduct was such that it unduly influenced the jurors to the prejudice of the defendant's case. We are asked to apply our customary rule found in *State v. McGee,* _____ W. Va. _____, 230 S.E.2d 832, 835–36 (1976),[6] that:

> "The trial judge in a criminal trial must consistently be aware that he occupies a unique position in the minds of the jurors and is capable, because of his position, of unduly influencing jurors in the discharge of their duty as triers of the facts. This Court has consistently required trial judges not to intimate an opinion on any fact in issue in any manner. In criminal cases, we have frequently held that conduct of the trial judge which indicates his opinion on any material matter will result in a guilty verdict being set aside and a new trial awarded. *See State v. Pietranton,* 137 W. Va. 477, 72 S.E.2d 617 (1952); *State v. Summers,* 118 W. Va. 118, 188 S.E. 873 (1936); *State v. Shelton,* 116 W. Va. 75, 178 S.E. 633 (1935); *State v. Austin,* 93 W. Va. 704, 117 S.E. 607 (1923); *State v. Staley,* 45 W. Va. 792, 32 S.E. 198 (1899); and *State v. Hurst,* 11 W. Va. 54 (1877)."

---

[6]*McGee* was overruled on other grounds in *State v. McAboy,* _____ W. Va. _____, 236 S.E.2d 431 (1977).

We have also recognized that a trial court has the right to control the orderly process of a trial and may intervene so long as such intervention does not operate to discriminate against or prejudice the defendant's case. This rule flows from the related principle that a trial court is accorded a considerable discretion in the trial of the case in order to handle the manifold exigencies that may arise. *State v. Hankish*, 147 W. Va. 123, 126 S.E.2d 42 (1962); *State v. Justice*, 135 W. Va. 852, 65 S.E.2d 743 (1951); *State v. Hamrick*, 112 W. Va. 157, 163 S.E. 868 (1932). We have also indicated that a claim of improper trial court intervention must on occasion be viewed more broadly than from the narrow perspective of the incident itself. *State v. Starkey*, ____ W. Va.____, 244 S.E.2d 219, 226 (1978); *State v. Cokeley*, ____ W. Va. ____, 226 S.E.2d 40, 44 (1976).

Because this type of alleged error arises in the particular factual context of the individual case, it is often difficult to find precedent that is directly analogous. This has resulted in reliance on broad general statements, such as those set out above.

It is apparent from the foregoing law that we recognize that a trial judge in a criminal case has a right to control the orderly process of a trial and may intervene into the trial process for such purpose, so long as such intervention does not operate to prejudice the defendant's case. With regard to evidence bearing on any material issue, including the credibility of witnesses, the trial judge should not intimate any opinion, as these matters are within the exclusive province of the jury. On the basis of the foregoing standards, we now address the specific incidents.

One comment of the court followed several questions on cross-examination, where the State's witness was sought to be impeached by her written statement.[7] The

---

[7] "[The Court]: This is a matter of rape there, Mr. Kaull. I think if you want to put into the record the statement you may do it and let the jury decide what was said in the statement and what this

particular point was that during her direct examination, the witness had stated the gunman made a remark to the defendant to the effect that "[W]e want to get a little drunk, don't we? ...." In her written statement, she had the gunman saying "[D]on't you want to get a little drunk?" Initially, the witness had some difficulty understanding the impeachment point, but ultimately maintained that the word "we" was used by the gunman, and not "you" as in the written statement. The witness' written statement was admitted into evidence and the jury was permitted to review it. The troublesome aspect of this incident is that the court intervened in defense counsel's cross-examination without waiting for any objection by the State. Furthermore, the intervention occurred as defense counsel was attempting to have the witness openly acknowledge that there was a discrepancy between her written statement and her testimony on direct examination. Finally, the court's remarks were overbroad in the sense that they went beyond the narrow issue at hand, which was whether defense counsel was arguing with the witness, and suggested to the jury that in the court's mind there was no discrepancy.

Balanced against this is the fact that defense counsel in his prior questions had explored the discrepancy and had read the pertinent portions of her statement to the witness, so that the jury was acquainted with the point. Moreover, the issue centered on a selection between the pronouns "you" and "we," which did not go to a material issue bearing on the witness' credibility. Finally, under either version the basic communicative sense of the witness' language was the same. We thus do not consider the trial court's remark to be reversible error.

The next incident relates to defense counsel's question to the defendant, Burton, as to why the State's witness Myers was in jail. Burton stated that Myers had been

witness said. She repeated what she said. When I read that statement, where I hear her read it, I could put the same interpretation on it she put on it. Let the jury decide whether or not she changed her story, that is fine, but I don't think you should argue with her."

placed in his cell because "I thought that someone, some authorities had put him in the same cell block with me to get information." The State objected to this portion of the answer as a conclusion, which was sustained by the trial court with the comment, "I don't like the insinuation." The ruling was clearly correct, and while the comment was gratuitous, it was not prejudicial in any material degree.

Following this exchange, defense counsel asked the defendant why Myers was in jail, and the State objected. The court pointed out that the jury had previously been informed that Myers was in jail by virtue of the extradition charge.[8] The record discloses that on defense counsel's cross-examination of Myers this fact was brought out by way of an agreed statement from the court when Myers first invoked the Fifth Amendment. There was no prejudice to the defendant by the court's remarks sustaining the objection, because the jury had already been fully apprised of this fact by agreement of the parties.

Further complaint is made concerning the court's remark on sustaining the State's objection to introducing certain paycheck stubs of the defendant.[9] The defendant had testified to the amount of the checks in order to

---

[8]"[The Court]: I think I told the jury why he was in jail, didn't I? He was in there because of an extradition proceeding.

. . . .

"When he took the Fifth Amendment, I told the jury what he was in jail for. He was in jail for extradition proceedings, period. He was not in there for any legal violation. What he took the Fifth Amendment on is other violations that had nothing to do with the confinement here. I will sustain the objection."

[9]"On No. 2, the court is of the opinion that is immaterial and irrelevant. Besides that, the proper foundation was not introduced. It was not a paper that was made out by this individual so you have no foundation and is not admissible. The check stubs are not admissible because they were not introduced by the proper parties. *Anyone could make the check stubs out,* so that could be—would not be admissible. Besides that, I don't see where it is material, as to the violation that occurred . . . ." [Emphasis supplied]

show his lack of motive for robbing the bar. He contends that the court implied that he had altered the check stubs. We do not read this innuendo into the court's explanation, since the defendant was not mentioned in the court's remarks.

Finally, the defendant contends that the court made prejudicial remarks in regard to permitting the State to reopen its case, and subsequent remarks the next morning to the jury after the State had withdrawn its motion to reopen.

This incident arose when the State learned near the end of the case that Jones, who allegedly was the masked gunman at the bar, had been apprehended in Cleveland and was willing to waive extradition. The State moved the court to permit the case to be reopened and the court, after weighing the matter carefully in chambers with counsel, stated it would continue the case to the next day in order to permit the State to return Jones from Cleveland. The court then advised the jury of the reopening, but we see nothing inimical to the defendant's case in these statements.[10]

The following morning the prosecutor advised the court and defense counsel in chambers that Jones would not testify unless he was granted immunity from prosecution on the armed robbery charge, which the State was unwilling to recommend. At this point, the court indicated it felt obligated to make a statement to the jury as to why the witness Jones would not testify. De-

---

[10]"Ladies and gentlemen of the jury, some people think that the judge has a pretty easy job, that all he has to do is sit up here and go to sleep. It is not that easy. You, of course, heard the motion for a reopening by the State, continuance by the State this morning, just now. After a discussion of this motion, these motions, in chambers, it appears to the court that Mr. Jones, who you have heard referred to throughout this trial, apparently has been apprehended in Cleveland, Ohio. The Prosecutor had no knowledge, the State had no knowledge until during the trial here this morning, when the Sheriff . . . ."

fense counsel objected on the basis that the court should remain silent on the matter.

We are not directed to any particular prejudicial language in the statement.[11] There was obviously some need on the part of the court to give an explanation to the jury as to why the witness, who the court had told the jury would appear, was not appearing.

Several other errors relating to the court's comments are assigned, but on examining the record we do not find that any objections were made to them. Ordinarily, without objection we will not consider such matters on appeal. *State v. Starkey*, ___ W. Va. ___, 244 S.E.2d 219, 227 (1978); *State v. McGee, supra; cf. State v. Pietranton*, 137 W. Va. 477, 492, 72 S.E.2d 617, 625 (1952).

## V

## VENUE

As a final assignment, the defendant claims the State failed to prove the venue of the crime. Neither side disputes that the State has the burden of proving the venue; that is, that the crime occurred in the county where the defendant is tried. This requirement arises by virtue of Article III, Section 14 of our State Constitution. *State v. Tapp*, 153 W. Va. 759, 172 S.E.2d 583 (1970).

It has long been established in our law that venue can be established by circumstantial evidence. Syllabus Point 2, *State v. Stephenson*, 114 W. Va. 458, 172 S.E. 533 (1933); *State v. Alderson*, 74 W. Va. 732, 82 S.E. 1021 (1914). In *State v. Hobbs*, 37 W. Va. 812, 17 S.E. 380 (1893), venue was established by showing that the coroner who examined the victim was the official coroner of the county. In *State v. McDonie*, 89 W. Va. 185, 109 S.E. 710 (1921),

---

[11]"In view of the fact that the witness for which we recessed until today to hear has refused to testify unless he was granted immunity from prosecution on the armed robbery case, and the State refusing to grant such immunity, the motion to reopen, or the motion to withdraw the reopening of the State's case is granted, ..."

and *State v. Hensley*, 86 W. Va. 434, 103 S.E. 204 (1920), the evidence showed the crime was committed in a given town and this Court took judicial notice that the town was within a particular county.

In general, there are two lines of authority regarding the question of whether the State has to prove venue beyond all reasonable doubt, or whether it is sufficient to prove venue by a preponderance of the evidence. 23 C.J.S. *Criminal Law* § 914(c); Annot., 67 A.L.R.3d 988 (1975). The difference between these two views is that those courts which require proof of venue beyond a reasonable doubt focus on the fact that venue is a necessary jurisdictional element to sustain a criminal conviction. *See, e.g., State v. Evely*, 228 N.W.2d 196 (Iowa 1975); *Willis v. Commonwealth*, 339 S.W.2d 174 (Ky. 1960); *State v. Cooksey*, 242 Ore. 250, 409 P.2d 335 (1965).

Those courts holding that a preponderance of the evidence is sufficient take the view that venue has no bearing on the guilt or innocence of the accused as far as the commission of the crime is concerned. *See, e.g., United States v. Luton*, 486 F.2d 1021 (5th Cir. 1973), *cert. denied*, 417 U.S. 920, 41 L. Ed. 2d 225, 94 S.Ct. 2626; *People v. Arline*, 13 Cal. App. 3d 200, 91 Cal. Rptr. 520 (1970); *State v. True*, 330 A.2d 787 (Me. 1975); *People v. Hetenyi*, 304 N.Y. 80, 106 N.E.2d 20 (1952); *State v. Brown*, 97 R.I. 95, 196 A.2d 138 (1963); *State v. Greene*, 86 S.D. 177, 192 N.W.2d 712 (1971), *cert. denied*, 406 U.S. 929, 32 L. Ed. 2d 131, 92 S.Ct. 1805.

While it does not appear that we have had occasion to determine this precise point, it is clear that our prior cases have been liberal in weighing the State's proof of venue. There is no question that venue is a jurisdictional element of proof in a criminal trial under Article III, Section 14 of our Constitution. *Ex parte Brinkman*, 93 W. Va. 351, 116 S.E. 757 (1923). We are not involved with removing proof of venue in a criminal case, but with determining the amount of proof required.

We believe that the better reasoned approach is to recognize that venue is not a fact which relates to the

guilt or innocence of the accused. It is therefore not a substantive element of the crime and need not be proved beyond a reasonable doubt. We conclude that the State in a criminal case may prove the venue of the crime by a preponderance of the evidence, and is not required to prove the same beyond a reasonable doubt.

In the present case, one of the State's witnesses was asked if the defendant had indicated he participated in the "escapade that took place at a night club here in Grafton." The witness responded, "If you are talking about the End of the Bridge, yes sir." There is no dispute in the evidence that the rape occurred at the bar known as the End of the Bridge. We judicially note that Grafton is the county seat of Taylor County. *State v. McDonie, supra; State v. Hensley, supra.*

Evidence was also introduced that the defendant upon arrest was lodged in the Taylor County Jail. Moreover, Mrs. Duckworth's statement taken by Deputy Sheriff Donald L. Gay, who is identified in the statement as a deputy sheriff of Taylor County, was introduced into evidence on cross-examination. Based on these facts, there was sufficient proof of venue.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Taylor County.

*Affirmed.*